UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
REPUBLIC OF BENIN,

                                 Plaintiff,

                  - against-

BEVERLY MEZEI, ROBIN SHIMOFF, OFFICE OF
THE REGISTER OF THE CITY OF NEW YORK, and
THE CITY OF NEW YORK,

                             Defendants.
-------------------------------------------------------------------X

06 CV 0870
(JGK)(MHD)

COUNTERSTATEMENT
PURSUANT TO
LOCAL RULE 56.1

      Mezei[1] respectfully submits the following counterstatement of material facts

pursuant to Local Rule 56.1. The responses below correspond seriatim to the numbered

statements set forth in plaintiff's statement under Local Rule 56.1:

      1.      No dispute.

      2.      Plaintiff is the former owner of the Property. Fischer Aff., Exhibit 1-A. On

October 1, 2004, plaintiff sold the Property to Shimoff. Fischer Aff., Exhibit 1-B;

Hesekiel Decl., Exhibit A; Koller Decl., ¶ 6. On October 11, 2005, Shimoff sold the

Property to Mezei, thus Mezei is the current owner of the Property. Fischer Aff., Exhibit

1-C; Mezei Decl., ¶¶ 2 and 3.

---

[1] This Counterstatement, made pursuant to Local Rule 56.1, uses the terms defined in the
October 20, 2006 declaration of Todd Harris Hesekiel the ("Hesekiel Decl.").

3.      In or about October 2004, plaintiff issued a decision, authorizing the transaction. Koller Decl., ¶ 4; Koller Decl., Exhibit 1.

4.      No dispute.

5.      In or about October 2004, plaintiff authorized the sale of the Property. Plaintiff also authorized Guedegbe to attend the closing and execute all documents on plaintiff's behalf.  Koller Decl., ¶¶ 4 and 6; Koller Decl., Exhibit 1.

6.      No dispute.

7.      Paragraph 7 of plaintiff's Local Rule 56.1 statement does not set forth a material fact.  Instead, it purports to draw a legal conclusion.  Notwithstanding this, Shimoff paid plaintiff $650,000 for the Property.  Hesekiel Decl., Exhibit A.  Mezei denies that Shimoff committed an "unlawful act."  Plaintiff's characterization of Shimoff's payment as an "unlawful act" is simply wrong, as plaintiff misreads, misinterprets, and misapplies the FMA.  *See* Mezei's memorandum of law ("Memorandum of Law"), Point III.

8.      Mezei admits that no document granting Guedegbe authority to enter into this transaction was recorded with the county clerk or register.  Mezei denies that any such recordation is required under the law.  RPL § 331; Memorandum of Law, Point IV.

9.     Paragraph 9 of plaintiff's Local Rule 56.1 statement does not set forth a material fact.  Instead, it purports to draw a legal conclusion.  Notwithstanding this, Mezei disputes that Guedegbe forged Deed I.  Hesekiel Decl., ¶¶ 4 through 8; Hesekiel Decl., Exhibits B through E; Koller Decl., ¶¶ 4 and 6; Koller Decl., Exhibit 1; Memorandum of Law, Points I and II.

10.     No dispute.

11.     No dispute.

Dated: October 20, 2006

ACKERMAN, LEVINE, CULLEN,
BRICKMAN & LIMMER, LLP

By:_____
          Todd Harris Hesekiel (TH-1289)

Attorneys for Plaintiff
175 Great Neck Road
Great Neck, New York  11021
     (516) 829-6900

202969

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

REPUBLIC OF BENIN,

                            Plaintiff,

              - against-

BEVERLY MEZEI, ROBIN SHIMOFF, OFFICE OF
THE REGISTER OF THE CITY OF NEW YORK, and
THE CITY OF NEW YORK,

                            Defendants.

------------------------------------------------------------------X

06 CV 0870
(JGK)(MHD)

DECLARATION OF
TODD HARRIS HESEKIEL

        TODD HARRIS HESEKIEL, under penalty of perjury, hereby declares in accordance with 28 U.S.C. § 1746:

        1.     I am an attorney, admitted to practice before this Court and the courts of the State of New York, and I am an associate of Ackerman, Levine, Cullen, Brickman & Limmer, LLP, attorneys for defendant Beverly Mezei ("Mezei").  I submit this declaration in opposition to plaintiff's motion for summary judgment.

        2.     This action arises out of a pair of real estate transactions.  In the affidavit of Stanley Fischer, sworn to July 21, 2006 (the "Fischer Aff."), plaintiff purports to recite the facts.  Plaintiff's version of the facts is skewed.  Eliminating plaintiff's slant, the undisputed facts in the record can be summarized:

            i.     On October 1, 2004, Thomas Guedegbe ("Guedegbe") executed a deed ("Deed I") that transferred title to 4668

Grosvenor Avenue, Bronx, New York (the "Property") from plaintiff to defendant Robin Shimoff ("Shimoff"). Fischer Aff., Exhibit 1-B.

ii.    Guedegbe signed his own name to Deed I, as plaintiff's Director of Administration, Ministry of Foreign Affairs. Fischer Aff., Exhibit 1-B.

iii.   According to public records maintained by the New York City Department of Finance, Shimoff paid $650,000 for the Property. (I attach as Exhibit A, a printout from the New York City Department of Finance's ACRIS website pertaining to the Property.)

iv.    On October 11, 2005, Shimoff executed a deed ("Deed II") that transferred title to the Property from Shimoff to Mezei. Fischer Aff., Exhibit 1-C.

v.     Mezei paid Shimoff $1.25 million for the Property. Accompanying declaration of Beverly Mezei dated September 29, 2006 ("Mezei Decl."), ¶ 3.

vi.    Mezei was a good faith purchaser of the Property for valuable consideration, and had no knowledge of any fraudulent intent on the part of Shimoff or of any fraud rendering void her title to the Property. Mezei Decl., ¶¶ 3, 4, and 5; *see also* plaintiff's memorandum of law, p. 6 (acknowledging that, for purposes of this motion, plaintiff does not dispute Mezei's status as a good faith/bona fide purchaser for value).

3.     During a May 18, 2006, conference with Judge John G. Koeltl, plaintiff's counsel made a number of representations regarding this case. Among other things, he claimed that Guedegbe forged Deed I by executing it without authority. Plaintiff portrayed Guedegbe as a rogue employee, who, acting completely on his own, defrauded his own government and the other parties.

4.    After receiving plaintiff's motion papers, I discovered a plethora of information that contradicts directly plaintiff's allegations. First, I obtained a copy of an October 1, 2004, letter to Triad Abstract Ltd. (which I understand was an agent of Shimoff's title insurer) from Alfred Koller ("Koller"), the attorney who represented plaintiff in its sale of the Property, and the delivery of Deed I, to Shimoff. Koller's letter (the "Koller Letter"), which is dated the same day as Deed I, states that Koller confirmed with plaintiff's Foreign Minister that Guedegbe was authorized to enter into the transaction and, on behalf of plaintiff, execute all documents in connection with the sale of the Property. A copy of the Koller Letter is attached as Exhibit 1 to Koller's accompanying September 29, 2006, declaration (the "Koller Decl.") in opposition to plaintiff's motion.

5.    I spoke to Koller on September 7, 2006, after reviewing his October 1, 2004, letter. During our conversation, Koller told me the following:

(1)    He represented plaintiff in its sale of the Property to Shimoff;

(2)    During his representation of plaintiff, he had at least three meetings with Rogatien Biaou ("Biaou"), then plaintiff's Foreign Minister;

(3)    During these meetings, at least one of which occurred at plaintiff's Foreign Mission Office, Biaou, on behalf of plaintiff, authorized the sale of the Property;

(4)    Biaou authorized Guedegbe to execute all documents relevant to the transaction on behalf of plaintiff; and

(5)    Biaou was unable to attend the closing on the Property, which occurred on October 1, 2004, because he had to travel to France.

3

The Koller Decl. confirms all of these facts.

6.      After my conversation with Koller, I conducted an internet search for additional information related to plaintiff's sale of the Property. I found a number of news reports corroborating Biaou's purported involvement in the transaction. I attach as Exhibit B, one these reports.

7.      Biaou, as plaintiff's Foreign Minister, unquestionably had authority to enter into transactions binding his country. For example, public records reflect that on March 4, 2005, Biaou executed, on behalf of plaintiff, an economic agreement with the African Development Foundation, a United States Government agency that provides investment capital to small businesses and producer groups in 15 African countries. *See* Exhibit C. Similarly, around June 15, 2004, Biaou executed agreements, on behalf of plaintiff, with the Moroccan Minister of Foreign Affairs, regarding issues such as diplomatic visas and investments between Benin and Morocco. *See* Exhibit D.

8.      In fact, during a conference with Judge Koeltl on September 14, 2006, plaintiff exchanged with all parties the September 14, 2006, letter of Karmou Alfo Zerandouro, plaintiff's "Consulate Officer" ("Zerandouro Letter"). I attach a copy as Exhibit E. The Zerandouro Letter indicates at paragraph 4 that the Property was under Biaou's authority and that Biaou was responsible for the Property, based upon his status as Foreign Minister. Exhibit E, ¶ 4. Thus, plaintiff admits that Biaou had authority over this transaction.

9.    In addition to its forgery allegation, plaintiff also contends that the sale of the Property to Shimoff and the subsequent sale of the Property from Shimoff to Mezei are void under the Foreign Missions Act (22 U.S.C. §§ 4301, et seq. ["FMA"]).

10.    On September 18, 2006, I called Richard Massey ("Massey"), Office Director of Real Estate Matters in the United States Office of Foreign Missions.

11.    During our telephone conversation, Massey told me that he was aware of the dispute regarding the Property.  He also told me, during this and a subsequent, September 20, 2006, conversation, that neither he nor anyone he spoke to in the United States Office of Foreign Missions' Law Department believed that a foreign government's failure to provide written notification to the Secretary of State before selling its mission property to a United States citizen would render the transaction void. Massey concurred that the language of the FMA does not provide for voiding such a transaction, and noted, as Mezei notes in our accompanying memorandum of law, that a distinction exists between property acquired and property sold by a foreign mission. Mezei's memorandum of law, Point III; 22 U.S.C. § 4305(b).

12.    At the conclusion of our September 20, 2006 telephone conversation, I asked Massey if the Office of Foreign Missions could provide written confirmation of its position, or issue some form of advisory opinion.  Massey told me that since this matter was in litigation, he could not provide any further information, whether

in writing or not, absent legal process.  He did say that if the Court requested advice from the Office of Foreign Missions, the Law Department might issue an advisory opinion.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 20, 2006

_____
TODD HARRIS HESEKIEL (TH-1289)

201758

**MEZEI
DECL.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
REPUBLIC OF BENIN,

                        Plaintiff,

             - against-

BEVERLY MEZEI, ROBIN SHIMOFF, OFFICE OF
THE REGISTER OF THE CITY OF NEW YORK, and
THE CITY OF NEW YORK,

                        Defendants.
-------------------------------------------------------------------X

06 CV 0870
Judge Koeltl

DECLARATION OF
BEVERLY MEZEI

BEVERLY MEZEI declares under penalty of perjury as follows:

1.     I am a defendant in the above-captioned action. I submit this declaration in opposition to plaintiff's motion for summary judgment.

2.     On October 11, 2005, I purchased from defendant Robin Shimoff ("Shimoff") a piece of real property in Bronx County, New York, identified as 4668 Grosvenor Avenue (the "Property").

3.     I paid Shimoff $1.25 million for the Property.

4.     At the time I purchased the Property, I had no knowledge of any fraudulent intent on the part of Shimoff pertaining to Shimoff's purchase or sale of the Property. In fact, when I purchased the Property, I believed that Shimoff had good title to it. Similarly, at the time I purchased it, I had no knowledge of any fraud in the chain of title to the Property.

5.   I continue to believe that Shimoff had good title to the Property when she sold it to me, and that Shimoff conveyed good title.

6.   For these reasons, and for the reasons set forth in the declarations of Todd Harris Hesekiel and Alfred Koller, as well as the accompanying memorandum of law, plaintiff's motion for summary judgment should be denied.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on September 29, 2006


_Beverly Mezei_
BEVERLY MEZEI


201865

**KOLLER
DECL.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

REPUBLIC OF BENIN,

                           Plaintiff,

                - against-

BEVERLY MEZEI, ROBIN SHIMOFF, OFFICE OF
THE REGISTER OF THE CITY OF NEW YORK, and
THE CITY OF NEW YORK,

                        Defendants.
-------------------------------------------------------------X

06 CV 0870
Judge Koeltl

DECLARATION OF
ALFRED KOLLER

        ALFRED KOLLER declares under penalty of perjury as follows:

        1.     I am an attorney admitted to practice before this Court.[1]

        2.     In or about October 2004, I represented the Republic of Benin with respect

to its sale of a piece of real property in Bronx County, New York, identified as 4668

Grosvenor Avenue ("the Property").

        3.     In conjunction with that transaction, I had at least three meetings with

Rogatien Biaou, the Foreign Minister of the Republic of Benin.

---

[1] It has been brought to my attention that my registration status with the New York State
Supreme Court Appellate Division, First Judicial Department was "suspended" on October 19,
1998 for failure to pay timely my attorney's registration fees. I was aware that my 1998 dues
were paid late; however, I was unaware that I was deemed "suspended" as a result. I have paid
my dues timely since 1998. Aside from this 1998 incident, I have never been suspended from
practicing law for any reason. I am in contact with the Appellate Division, First Department, in
an effort to correct this problem.

4.    During these meetings, Mr. Biaou told me that the Beninese government authorized the sale of the Property.  Mr. Biaou also told me that Thomas Guedegbe was authorized to execute all documents relevant to this transaction for the Republic of Benin.

5.    Mr. Biaou was unable to attend the closing of the Property.

6.    As a result of Mr. Biaou's inability to attend the closing, and in accordance with Mr. Biaou's earlier advice to me, Mr. Guedegbe attended the closing and executed all documents on behalf of the Republic of Benin.

7.    I attach as Exhibit 1 a copy of a letter that I signed to Triad Abstract Ltd. on October 1, 2004, addressing the same issues as discussed herein.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 29, 2006

ALFRED KOLLER (AK-1127)

201205

2

1

10/1/04

RIAD ABSTRACT LTD.
67 MINEOLA BLVD.
MINEOLA, NY   11501

RE: TITLE NO.: TA24136 B
    GROSVENOR AVENUE, BRONX
    BLOCK 5821, LOT 2804

GENTLEMEN:

        THIS IS TO ADVISE THAT THE
FOREIGN MINISTER OF THE REPUBLIC
OF BENIN HAS TOLD ME THE THOMAS
UEDEGBE, DIRECTOR OF ADMINISTRATION,
MINISTRY OF FOREIGN AFFAIRS OF SAID
REPUBLIC, HAS AUTHORITY TO EXECUTE
ALL DOCUMENTS IN CONNECTION WITH
THE SALE OF THE ABOVE PREMISES
TO ROBIN STIMOPE ON THIS DATE. I
SHALL FORWARD A LETTER TO THIS EFFECT FROM
THE FOREIGN MINSTER.

                ALFRED KOLLER, ESQ.
                1255 FIFTH AVENUE
                NEW YORK, NY 10029
                (212) 427-3595

EXHIBIT A

New York City Department of Finance
**Office of the City Register**

HELP
[Click help for additional instructions]
Selecting a help option will open new window

*Current Search Criteria:*

**Borough:** BRONX
**Block:** 5821
**Lot:** 2804
**Date Range:** To Current Date
**Document Class:** All Document Classes

# Search Results By Parcel Identifier

Records 1 - 4 << previous    next >>    Max Rows 10 ▾    [Search Options ] [New BBL Search] [Edit Current Search] [Print Index]

| View | Reel/Pg/File | CRFN | Lot | Partial | Recorded / Filed | Document Type | Pages | Party1 | Party2 | Party 3/ Other | More Party 1/2 Names | Corrected/ Remarks | Doc Amount |
|------|-------------|------|-----|---------|------------------|---------------|-------|--------|--------|---------------|---------------------|--------------------|-----------|
| DET IMG | | 2005000593161 | 2804 | ENTIRE LOT | 10/24/2005 3:10:47 PM | DEED | 4 | SHIMOFF, ROBIN | MEZEI, BEVERLY | | | | 1,250,000 |
| DET IMG | | 2004000783138 | 2804 | ENTIRE LOT | 12/22/2004 10:28:56 AM | DEED, OTHER | 4 | THE REPUBLIC OF BENIN | SHIMOFF, ROBIN | | ✓ | | 650,000 |
| DET IMG | 390/206 | | 2804 | ENTIRE LOT | 5/10/1979 | COURT ORDER | 9 | THE CITY OF NEW YORK | | | | | 0 |
| DET IMG | 318/1624 | | 2804 | ENTIRE LOT | 11/5/1976 | DEED | 1 | FINANCE ADMINISTRATOR OF THE CITY OF NEW YORK | THE CITY OF NEW YORK | | ✓ | | 0 |

| Search Options | New Parcel Identifier Search | Edit Current Search |

EXHIBIT B




**Sound Vision For The Fut**

**HOME**
- ▸ Local News
- ▸ Education
- ▸ Health
- ▸ Business
- ▸ Entertainment
- ▸ Newspapers
- ▸ Sports
- ▸ Television Guide
- ▸ Radio Guide
- ▸ Marketing
- ▸ Archives
- ▸ Contact Us

**Other Links**
- ▸ BBC
- ▸ CNN
- ▸ Soccernet
- ▸ Zambiantourism
- ▸ UNZA
- ▸ Times of Zambia
- ▸ Zambia Daily Mail
- ▸ The Post

**ZNBC TELEVISION**

**ISIDINGO**



**Everyday at 20:10 hours**

**Mass Media
Complex
Alick Nkhata Road
P.O. Box 50015
Lusaka
Zambia**

**Tel:** 260-1-253301 /
252005
**Fax:** 260-1-254013
**Telex:** ZA 41221

### Benin's fires minister for graft

Benin's president has sacked his foreign minister on suspicion of links to a corruption scandal.

As a minister, Rogatien Biaou enjoyed immunity from prosecution.

A commission was set up last year by the president to investigate the illegal sale of the land surrounding Benin's embassy in New York.

It is the first time President Mathieu Kerekou has dismissed a minister suspected of corruption. Mr Biaou has not commented on the allegations.

The BBC's Esther Tola in Cotonou says Mr Biaou is due to be interviewed by police.

Mr Kerekou announced the dismissal at a cabinet meeting.

"The individual concerned has been placed at the disposal of the commission charged to investigate the matter of the illegal sale of the property of Benin's embassy in the United States," AFP news agency quotes the presidential decree as saying.

At the time of the alleged land sale, Mr Biaou was secretary-general in the foreign ministry. He went on to head the ministry in 2003.

A one-time military leader, President Kerekou is coming to the end of his second term in office.

He is barred by a constitutional age limit from running in presidential polls in March.

BBC

<>

**Search**

Go
◦ **The Web**
ZNBC

**RADIO FREQUENCIE**

**RADIO ONE**

| | |
|---|---|
| Chipata | 93.1 MHz |
| Kapiri | 97.8 MHz |
| Kasama | 88.2 MHz |
| Lusaka | 102.0 MHz |
| Mansa | 86.1 MHz |
| Mongu | 95.1 MHz |
| Senkobo | 89.3 MHz |
| Solwezi | 95.1 MHz |

**RADIO TWO**

| | |
|---|---|
| Chipata | 96.3 |
| Kapiri | 88.2 |
| Kasama | 92.3 MHz |
| Lusaka | 95.8 MHz |
| Mansa | 91.7 MHz |
| Mongu | 91.9 MHz |
| Senkobo | 97.1 MHz |
| Solwezi | 91.6 MHz |

**RADIO FOUI**

| | |
|---|---|
| Kabwe | 92.2 MHz |

| Kitwe | 92.2 MHz |
| Livingstone | 95.5 MHz |
| Lusaka | 88.2 MHz |
| Ndola | 94.5 MHz |



Site Developed & Hosted by Zamnet Communications  System Limited

EXHIBIT C



**NEWS RELEASE:**
For Immediate Release

**CONTACT:**
Moulero Omer Adeye
African Development Foundation
(229) 30.67.51

### American Delegation Arrives in Cotonou to Sign Agreement on Small Business Investment

*African Development Foundation Will Deliver Investment Capital to 40 Small Businesses;*
*ADF and Government of Bénin Agree to Commit Up to $2 Million Per Year to Program*

COTONOU – March 3, 2005 – Leaders of the African Development Foundation (ADF), a United States Government agency that provides investment capital to small businesses and producer groups in 15 African countries, will visit Bénin this week to sign an agreement that will create a new investment program for Béninese businesses and producer groups.

ADF and the Government of Bénin have agreed to jointly commit up to US $2 million annually to an ADF program that will provide expansion capital to up to 40 small businesses over the next five years.

On Friday, March 4, the ADF delegates plan to meet with President Mathieu Kérékou, Mr. Rogatien Biaou, the Minister of Foreign Affairs, and other senior ministers of government. ADF President Nathaniel Fields and Minister Biaou will then sign the new investment agreement in an official ceremony at the Ministry of Foreign Affairs.

"ADF's strategic partnership with the Government of Bénin will provide dozens of small enterprises with the catalyst capital they need to take their business to a new level," said Mr. Fields. "We appreciate the commitment that the Government of Bénin has shown to investing in the development of small businesses and producer groups."

The ADF program will provide small- and medium-sized businesses with investment capital to help them develop new products, sell their products in domestic and international markets, and attract new streams of private capital. The initiative will deliver awards of up to US $250,000 each to privately held small companies, farmer associations, and other small enterprises. ADF's Bénin staff will also provide small businesses with training and technical assistance in financial management, business management, and marketing.

**- MORE -**

The program will operate with four specific goals:

- Stimulating the development, competitiveness, and viability of farmer cooperatives, producer associations, and small and medium enterprises (SMEs);
- Increasing the competitiveness of Béninese small enterprises and producer groups in regional and international markets;
- Promoting trade and investment between Bénin and the United States under the framework of the African Growth and Opportunity Act (AGOA); and
- Reducing poverty through the creation of new jobs and higher incomes for employees.

ADF will begin accepting applications from small businesses and farming cooperatives this year, and businesses interested in applying for support can contact ADF's country representative, Dr. Moulero Omer Adeye, at the ADF office in Cotonou.

The ADF delegation will meet with leaders of the National Chamber of Commerce and visit a selection of small enterprises in Cotonou before its departure for Mali on Saturday, March 5.

The delegation is led by Mr. Fields, who is a former USAID deputy assistant administrator for Africa. It includes Ward Brehm, ADF's board chairman, and board members Jack Leslie and Ephraim Batambuze. The group is accompanied by Mrs. Rama Bah, who serves as ADF's regional program coordinator for Benin and five other west African nations.

Mr. Brehm is a Minneapolis, Minnesota businessman and philanthropist who has been actively involved in African development issues for more than a decade as a private citizen, church member, and as a member of two United States Congress delegations to Africa.

Mr. Leslie is chairman of Weber Shandwick Worldwide, one of the world's leading public relations agencies. He is a member of the Council on Foreign Relations, former chairman of USA for UNHCR (the United Nations Refugee Agency), and has been a member of UNHCR missions to Afghanistan (1998), Kosovo (1999), and Tanzania (2001).

Dr. Batambuze is a practicing cardiologist with Prairie Cardiovascular Consultants, the largest heart care program in the state of Illinois. Born in Uganda, he studied medicine at Makerere University and came to the United States in the early 1970s to complete a residency in internal medicine in Chicago. Rising political violence in Uganda under the Amin regime prevented him from returning home, and he was granted political asylum and American citizenship.

*The African Development Foundation (ADF) is a United States Government agency dedicated to expanding access to economic opportunity in Africa. Over the past 20 years, ADF has funded 1,600 projects in support of African entrepreneurs and local African communities. For more information on ADF, its programs, and its application guidelines for Bénin, go to www.adf.gov/benin.htm.*

###

EXHIBIT D

**News>>Events>>King Mohammed VI in Cotonou since yesterday Since yesterday**
- Declaration of the Professional media associations
- Benin-Germany Horst Köhler in a 4-day visit in Benin
- Corruption in Benin
- King Mohammed VI in Cotonou since yesterday Since yesterday
- Key-dates

| News |
|---|
| Councils of ministers |
| Official communiques |
| Dailies of the Republic |
| Guest |
| Events |
| |
| |

**Benin-Morocco**

# King Mohammed VI in Cotonou since yesterday
# Since yesterday

15 June at 17 : 30, His Majesty Mohammed VI, king of Morocco has been in Benin. At the International airport of Cotonou Cadjèhoun where he was welcomed by President Mathieu Kérékou, the king of Morocco, after the military honours went to the university campus of Abomey-Calavi where he inaugurated the Hassan II building, funded by the Morocco kingdom up to F CFA 800 million.

The step of Abomey-Calavi was very short, just the time to listen to some explanations about the construction of the building whose façade is in H-shape, immortalising the memory of the late Hassan II.

After the cutting of the symbolic ribbon which officially inaugurates the building, President Mathieu Kérékou and King Mohammed VI visited some dormitories before coming back to Cotonou.

In the palace of the presidency of the republic, the two heads of State had a tête-à-tête followed by a work session extended to both official delegations. This session resulted in the signature by Mohammed Benaïsa, Moroccan minister of foreign affairs, and Rogatien Biaou, his Beninese counterpart, of a number of agreements. So, there was the signature of the agreement protocol related to the suppression of visas for holders of diplomatic, service and special passport.

The second agreement aims at encouraging and protecting mutually, investments in Benin and Morocco.

Through a third accord, both countries agreed to recognise mutually driving licenses delivered in Benin and Morocco.

Also, the joint Commission of the Morocco-Benin cooperation held in Cotonou from 4 to 8 March 2004 was signed.The day ended with a gala dinner offered in the honour of our guest.This morning, the king, accompanied by the minister of State, Bruno Amoussou, will head to Porto-Novo where he will visit the site hosting the ongoing construction of the Supreme Court.

Before departing for Rabat, the Moroccan delegation will release a communiqué.

**By Edgard COUAO-ZOTTI**

25/06/04

**Translated by <u>Gilles DOVONOU</u>**

© 1996 – 2005 Gouvernement du Bénin tous droits réservés

EXHIBIT E

*Mission Permanente*
*de la République du Bénin*
*Auprés des Nations Unies*



*Permanent Mission of*
*the Republic of Benin*
*to the United Nations*

*125 East 38th Street, New York, N.Y. 10016*
*Tel: (212) 684-1339   Fax: (212) 684-2058*

14 September 2006

Dear FISCHER

Further to our Wednesday 13 September 2006 telephone conversation, I would like to inform of the following :

1- The Republic of Benin owns three properties in Washington DC. None of these three properties has been sold to date;

2- Benin Government has established a Commission of inquiry in Benin to investigate the sale of the portion of its property in New York serving as Residence of Benin Ambassador to the United Nations. The responsibility of MR Thomas GUEDEGBE, signatory of the deed, has been established. Therefore, MR Thomas GUEDEGBE has been placed in detention.

3- The former Ambassador and the former Minister of Foreign Affairs of Benin are not co-signatories of the sale of the property.

4- The Government of Benin has engaged the responsibility of the former Ambassador and the former Minister of Foreign Affairs in the case because the property is under their authority..

Karimou ALFA ZERANDOURO
Consulate Officer

FISCHER and BURSTEIN, PC
Att. Stanley FISCHER
Telecopy :516 829 5973

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
REPUBLIC OF BENIN,

                    Plaintiff,                            06 CV 0870
                                                        (JGK)(MHD)

       -against -

BEVERLY MEZEI, ROBIN SHIMOFF, OFFICE OF
THE REGISTER OF THE CITY OF NEW YORK, and
THE CITY OF NEW YORK,


                    Defendants.
-------------------------------------------------------------X


MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT


                                 ACKERMAN, LEVINE, CULLEN
                                   BRICKMAN & LIMMER, LLP
                              Attorneys for Beverly Mezei
                              175 Great Neck Road
                              Great Neck, New York  11021
                                 (516) 829-6900

# **TABLE OF CONTENTS**

**Page**

Preliminary Statement.................................................................1

Argument

POINT I - Guebegbe's Signature on
          Deed I is not a Forgery...........................................2

POINT II - Summary Judgment is Premature
          as Factual Issues Exist Regarding the
          Allegation that Guedegbe Forged Deed I.........................9

POINT III - Plaintiff's Interpretation and
          Proposed Application of the FMA are Erroneous...............14

    A.   22 U.S.C. § 4305........................................................15

    B.   22 U.S.C. § 4311........................................................18

POINT IV - Plaintiff's Interpretation and
          Proposed Application of RPL § 331 are Erroneous..............20

Conclusion.................................................................................21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
REPUBLIC OF BENIN,

                         Plaintiff,

              - against-

BEVERLY MEZEI, ROBIN SHIMOFF, OFFICE OF
THE REGISTER OF THE CITY OF NEW YORK, and
THE CITY OF NEW YORK,


                         Defendants.
-------------------------------------------------------------------X

06 CV 0870
(JGK)(MHD)



## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT


### PRELIMINARY STATEMENT

Mezei[1] submits this memorandum of law in opposition to plaintiff's motion for

summary judgment.  Plaintiff's motion must be denied because Guedegbe's signature on

Deed I is not a forgery.  At the very least, questions of fact regarding Guedegbe's

authority to execute Deed I render plaintiff's motion premature.


    Plaintiff also misreads, misapplies, and misinterprets the FMA.  The statute does

not render a sale of property by a foreign government to a United States citizen void,

---

[1] This memorandum of law uses the terms defined in the October 20, 2006 declaration of
Todd Harris Hesekiel (the "Hesekiel Decl.").

1

simply because the foreign government failed to comply with the notification requirements of 22 U.S.C. § 4305.

In addition, plaintiff's reliance on New York Real Property Law ("RPL") § 331 is misplaced, as the statute does not impose an affirmative duty on a foreign government to record, in the office of the county clerk or register, documentation that an agent or attorney has been appointed by the foreign government to enter into real property transactions.

<u>ARGUMENT</u>

<u>POINT I</u>

GUEDEGBE'S SIGNATURE ON
<u>DEED I IS NOT A FORGERY</u>

Mezei agrees with plaintiff's statements that a forged deed cannot convey good title, that a person cannot be a bona fide purchaser (as that term is used in RPL § 266) through a forged deed, and that the act of recording a forged deed does not give validity to the deed.[2]  This is irrelevant to the motion, however, because Guedegbe's signature on Deed I is not a forgery.  It is undisputed that Guedegbe, the Director of

---

[2] Mezei also agrees with plaintiff's citation to *Karan v. Koskins,* 22 A.D.3d 638, 803 N.Y.S. 2d 666  (2d Dep't 2005), to the extent that *Karan* holds that a bona fide purchaser is protected in her title, as long as she has no previous notice of the alleged fraud by her grantor.  Plaintiff's memorandum of law, p. 7.  Since plaintiff accepts for purposes of this motion that "the facts are imputed most favorably to Defendant Mezei" (plaintiff's memorandum of law, p. 6), Mezei's status as a bona fide purchaser under RPL § 266 presently is not at issue.  As to the execution of Deed I, the only possible issue before the Court is whether Guedegbe's signature on Deed I is a forgery.

Administration for plaintiff's Ministry of Foreign Affairs, executed Deed I.  Plaintiff's

Rule 56.1 Statement, ¶ 4.  Guedegbe signed his own name, and indicated that he was

signing on behalf of plaintiff.  Fischer Decl., Exhibit 1-B.  Plaintiff does not allege, nor

does any fact in the record indicate, that Guedegbe represented that he was anyone other

than himself, or that he signed someone else's name to Deed I.  Accordingly, his

signature is not a forgery. *People v. Smith*, 306 A.D.2d 225, 226, 760 N.Y.S.2d 855, 855

(1st Dep't 2003) (defendant's signature of his own name on screenplay written by

someone else is not a forgery).

Plaintiff argues that Guedegbe lacked authority to execute Deed I on its behalf. [3]

While Mezei disputes this allegation (*see* Hesekiel Decl., ¶¶ 4 through 8; Koller Decl., ¶

4; Point II, below), even if plaintiff is right on the facts, Guedegbe's signature on Deed I

is not a forgery under the law.

In *Gilbert v. United States*, 370 U.S. 650 (1962), the Supreme Court addressed the

meaning of the term "forgery."  An accountant faced criminal charges under 18 U.S.C. §

495, based upon his endorsement of government tax-refund checks issued to his clients.

The statute provides:

§ 495.  Contracts, deeds, and powers of attorney

---

[3] Curiously, despite plaintiff's allegations of forgery and lack of authority, nowhere in
any of plaintiff's submissions to the Court (whether in plaintiff's complaint, the Fischer
Aff., or any of the other documents submitted in support of the motion) does plaintiff
deny receiving payment for the Property from Shimoff.

> Whoever falsely makes, alters, forges, or counterfeits any
> deed, power of attorney, order, certificate, receipt, contract, or
> other writing, for the purpose of obtaining or receiving, or of
> enabling any other person, either directly or indirectly, to
> obtain or receive from the United States or any officers or
> agents thereof, any sum of money; or
>
> Whoever utters or publishes as true any such false, forged,
> altered, or counterfeited writing, with intent to defraud the
> United States, knowing the same to be false, altered, forged,
> or counterfeited; or
>
> Whoever transmits to, or presents at any office or officer of
> the United States, any such writing in support of, or in
> relation to, any account or claim, with intent to defraud the
> United States, knowing the same to be false, altered, forged,
> or counterfeited--
>
> Shall be fined under this title or imprisoned not more than ten
> years, or both.

The accountant claimed that his clients gave him authority to endorse the checks on their

behalves, and that his inscription of their names on the checks, coupled with his own

signature as their agent or trustee, did not constitute a forgery under 18 U.S.C. § 495.

The district court disagreed with this interpretation of the statute, and convicted the

accountant. The Ninth Circuit upheld the conviction and the accountant appealed to the

Supreme Court.

Since the statute fails to define the term "forgery," the Court analyzed the

conviction under the common law meaning of the term. The Court held that a forgery

does not exist "where the falsity lies in the representation of facts, not in the genuineness

of execution." *Id.* at 658, quoting *Marteney v. United States*, 216 F.2d 760, 763-4 (10th Cir. 1954).[4]  Applying this standard, the Court vacated the conviction.

As in *Gilbert*, there is no statutory authority for the term "forgery," as that term is used by plaintiff in seeking to void Deed I and Deed II.  Therefore, we must look to the common law meaning of the term to assess whether Guedegbe's signature is a forgery. *Gilbert* at 655-56.  Under such analysis, it is not.

In *People v. Cunningham*, 2 N.Y.3d 593, 780 N.Y.S.2d 750 (2004), the New York Court of Appeals followed the *Gilbert* holding.  The defendant was convicted of forgery in the second degree under New York Penal Law ("PL") § 170.10, for signing his own name to a corporate check in excess of his authority (defendant had check signing authority, but only to a limited extent).  The Appellate Division affirmed defendant's conviction.  Citing *Gilbert*, the Court of Appeals reversed the decisions and vacated the indictment, holding that "defendant did not commit forgery merely by exceeding the scope of authority delegated by the corporation."  *Id.* at 599, 780 N.Y.S.2d at 755.  The *Cunningham* decision relied on the common law definition of forgery set forth in *Gilbert*, despite the PL § 170.10 explanation of the term.

---

[4] The Court noted that while it was possible that the accountant's signature of his clients' names was not done in the accountant's representative capacity, such a determination could not be made as a matter of law.  Therefore, it remanded the case to the district court for resolution of additional factual issues.  370 U.S. at 659.

While the *Gilbert* and *Cunningham* decisions address the concept of common law forgery as applied to "false agency endorsements," their scope is not limited to such instances. *United States v. Hunt*, 2006 U.S. App. LEXIS 20401, 17 (10th Cir. 2006), quoting *People v. Bendit*, 111 Cal. 274, 277, 43 P. 901, 901 (1896), and citing *State v. Kinder*, 315 Mo. 1314, 290 S.W. 130, 132 (1926) ("Although it was most often applied to false 'agency endorsements,' the rule followed from the broader common-law principle that '[a] false assertion of authority to write another's name, or to sign his name as agent, by which a person is deceived and defrauded, is not forgery.' The rule therefore applies not only to endorsements but to any form of unauthorized execution.").

The facts before this Court require application of the *Gilbert* and *Cunningham* holdings. Plaintiff alleges that although Guedegbe signed his own name to Deed I, his signature is a forgery. *Gilbert* and *Cunningham* contradict directly the result sought by plaintiff. Guedegbe's signature on Deed I is not a forgery merely because, as plaintiff alleges, Guedegbe lacked authority to sign on plaintiff's behalf. As the Court stated in *Gilbert*, the falsity alleged by plaintiff "lies in the representation of facts" (i.e., the authority of Guedegbe), not "in the genuineness of execution." 370 U.S. at 658, quoting *Marteney v. United States*, at 216 F.2d 763-64.

Nevertheless, plaintiff ignores completely the common law definition of forgery and urges this Court to apply the definition of forgery in PL § 170.10. Plaintiff's

memorandum of law, p. 5. There is no basis for this application since the forgery alleged by plaintiff is based on the common law.

Notwithstanding the inapplicability of PL § 170.10, we point out that plaintiff's recitation of the statute is incorrect. Rather than quoting PL § 170.10, plaintiff recites a portion of PL § 170.00. The statutes read as follows:

> PL § 170.00. Forgery; definitions of terms
>
> . . . .
>
> 4. "Falsely make." A person "falsely makes" a written instrument when he makes or draws a complete written instrument in its entirety, or an incomplete written instrument, which purports to be an authentic creation of its ostensible maker or drawer, but which is not such either because the ostensible maker or drawer is fictitious or because, if real, he did not authorize the making or drawing thereof.
>
> PL § 170.10. Forgery in the second degree
>
> A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument which is or purports to be, or which is calculated to become or to represent if completed:
>
> 1. A deed . . . which does or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status . . . .

Moreover, plaintiff relies mistakenly on the statutes in support of its argument that Guedegbe's signature on Deed I is a forgery. Here, *People v. Levitan*, 49 N.Y.2d 87, 424 N.Y.S.2d 179 (1980), is instructive.

7

One of the defendants, Levitan, signed three deeds transferring title to real property to entities controlled by her codefendants. All three deeds were signed in Levitan's own name -- one as an individual grantor and the others as an officer of corporate grantors, her codefendants. The codefendants confirmed that Levitan had authority to act on their behalf. At the time of the transactions, however, neither Levitan nor the corporate "grantors" owned the properties. Levitan and the corporate parties were convicted of forgery in the second degree. The Appellate Division affirmed the convictions and defendants appealed to the Court of Appeals.

The Court of Appeals reversed the Appellate Division and dismissed the indictments against all defendants. The court noted that, "While it is true that in certain rare instances one may commit a forgery by signing one's own name, this is so only where the signing is done in such a way as to deceive others into believing that the signer is in fact some third party." *Id.* at 90, 424 N.Y.S.2d at 181. The court held that Levitan's actions did not constitute a forgery under PL § 170.10, since there was no pretense that Levitan was anyone other than who she said she was. *Id.* at 91, 424 N.Y.S.2d at 182. Thus, even under the statutes cited by plaintiff, Guedegbe's signature on Deed I is not a forgery.

## POINT II

### SUMMARY JUDGMENT IS PREMATURE AS
### FACTUAL ISSUES EXIST REGARDING
### THE ALLEGATION THAT GUEDEGBE FORGED DEED I

In *Levitan*, the signatory's authority was not at issue.  The corporate grantors

conceded that Levitan had permission to enter into the transactions.  Here, plaintiff

argues the contrary.  Plaintiff alleges that Guedegbe had no authority to execute Deed I,

and therefore, although he signed his own name to the deed, his signature constitutes a

forgery.  As explained in Point I, plaintiff's position is meritless.  However, if arguendo

Guedegbe's authority is relevant to the determination of whether his signature on Deed I

is a forgery, any determination of the issue now is premature, since factual issues exist

regarding Guedegbe's authority.

FRCP 56(c) provides that a motion for summary judgment should only be granted

if "the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." *Loving v. N'Namdi*,

2006 U.S. Dist. LEXIS 62613 (S.D.N.Y. 2006).  If genuine issues of material facts exist,

summary judgment is improper.  *Gallo v. Prudential Residential Servs. Ltd. P'Ship*, 22

F.3d 1219, 1223 (2d Cir. 1994).

In addressing a summary judgment motion, the district court "must resolve all ambiguities and draw all reasonable inferences against the moving party." *Loving* at *3. Where "there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party," summary judgment must be denied. *Id.*

Plaintiff submits the statement of Aladi Boni Diallo ("Diallo"), Minister of Foreign Affairs of the Republic of Benin, in support of its motion (the "Diallo Statement"). [5] The Diallo Statement contains a number of conclusory allegations regarding Guedegbe's lack of authority based, in part, on Diallo's interpretation of plaintiff's constitution. It claims that "[n]o executive decision was issued by the Government of Benin to sell the [Property]" (Diallo Statement, ¶ 2); "[a]t no time did Benin, its Government and/or its Parliament intend to sell this property" (Diallo Statement, ¶ 4); and "[n]o individual was authorized to sell the said property" (Diallo Statement, ¶ 5).

Interestingly, the Diallo Statement does not contain the entire text of the portion of the constitution it paraphrases. Rather, plaintiff offers excerpts, choosing which words to quote and which to omit. There is no confirmation that the cited

---

[5] The Diallo Statement does not comply with 28 U.S.C. § 1746 because it does not recite that it was made under penalty of perjury under the laws of the United States. Its final certification, made by Simon B. Idohou, plaintiff's Ambassador to the United Nations, is also insufficient under FRE 902(3). The rule does not qualify an accredited ambassador to the United Nations to make the required certification. Under 28 U.S.C. § 1746 and FRE 902(3), the Diallo Statement is inadmissible.

language is even applicable to a real estate transaction such as this. If arguendo, the constitution applies to this transaction, the Diallo Statement provides no indication as to the form required by the constitution for the purported "prior approval either from the Government or from the Parliament." Diallo Statement, ¶ 1.

Even if approval from the "Government or from the Parliament" were necessary, plaintiff fails to submit significant evidence that no such authority was granted to Guedegbe by Biaou or anyone else. The only document in support of plaintiff's position on this subject is the Diallo Statement. Diallo is plaintiff's <u>current</u> Foreign Minister. She was not in office during Biaou's term, and claims no personal knowledge regarding decisions made before she took office. She cannot, accordingly, speak to the authority conferred on Guedegbe by Biaou or anyone else.

In addition, Mathieu Kerekou, plaintiff's president when Deed I was executed, no longer held office when the Diallo Statement was executed. There is no indication that Diallo conferred with former President Kerekou before submitting her statement. Since Diallo has no personal knowledge of these matters, the Diallo Statement has no probative value in determining whether Biaou or anyone else authorized the transaction.

Mezei, on the other hand submits the Koller Decl., which contradicts plaintiff's allegations regarding Guedegbe's authority. Koller represented plaintiff at the closing of the transactions that underlie Deed I. He met with Biaou, the sitting Foreign Minister at the time of this transaction, at least three times. Koller Decl., ¶ 3. During their meetings,

11

Biaou told Koller that Guedegbe had full authority to execute Deed I and transfer the Property from plaintiff to Shimoff.  Koller Decl., ¶ 4.

Since plaintiff submits the Diallo Statement as its official position with respect to the facts alleged in the complaint, the Diallo Statement evidences the authority plaintiff vests in its Foreign Minister.  In submitting the Diallo Statement, plaintiff acknowledges that Diallo, the current Foreign Minister, has authority to speak on behalf of and bind plaintiff's government.  In addition, the Zerandouro Letter (Hesekiel Decl., Exhibit E) indicates at paragraph 4 that the Property was under Biaou's authority and that Biaou was responsible for the Property, based upon his status as Foreign Minister.  In light of the Diallo Statement and the Zerandouro Letter, Biaou cannot have lacked authority to speak for his government, whereas Diallo has such authority, and plaintiff cannot now argue that Biaou, the former Foreign Minister, did not have the same authority.  The only factual issue is whether Biaou <u>authorized</u> the sale, not whether he had the <u>authority</u> to authorize it.

Koller's report of the facts surrounding this transaction contradicts directly plaintiff's unsupported, self-serving statements.  The discrepancy between Koller's sworn statement of the details and plaintiff's rather vague recitals creates, at the very least, a

question of fact regarding Guedegbe's authority to execute Deed I.[6]  On the one hand, the

current Foreign Minister claims that Guedegbe did not have authority to enter into the

transaction.  On the other, evidence submitted by Mezei indicates that the former Foreign

Minister did grant Guedegbe authority.

Mezei urges that Guedegbe's signature on Deed I is, as a matter of law, not a

forgery.  Even if that is not so, summary judgment is inappropriate since the facts

surrounding Guedegbe's authority are in clear dispute.  *Loving* at *3 (quoting *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 248 [1986]).[7]

---

[6] The Koller Decl. shows that Guedegbe had express authority to enter into the
transaction.  Even if Guedegbe did not have express authority, however, it appears from
his position with plaintiff's Ministry of Foreign Affairs, and the representations made by
Biaou, that he had at the very least apparent authority. *See Hallock v. New York*, 64
N.Y.2d 224, 485 N.Y.S.2d 510 (1984).  Apparent authority is, by its nature, fact
sensitive, and therefore, summary judgment on the issue is improper. *Friedler v.
Palyompis*, 12 A.D.3d 637, 784 A.D.2d 902 (2d Dep't 2004); *Baldassarre v. Morwill
Supermarket*, 203 A.D.2d 221, 609 N.Y.S.2d 345 (2d Dep't 1994); *Fogel v. Hertz Int'l,
Ltd.*, 141 A.D.2d 375, 529 N.Y.S.2d 484 (1st Dep't 1988).

[7] At a minimum, the following discovery is necessary to address the issue of Guedegbe's
authority: depositions of Guedegbe, Biaou, Diallo, Joel M. Adechi (plaintiff's former
United Nations Ambassador who lived at the Property at the time of the transaction and
may have been involved in the sale), and the other attorneys involved in the October 2004
closing.  Mezei also needs to obtain the records of any civil, criminal, and governmental
inquiries conducted in Benin or in the United States, as well as copies of the checks or
other forms of payment exchanged during the transaction.

POINT III

PLAINTIFF'S INTERPRETATION AND PROPOSED
APPLICATION OF THE FMA ARE ERRONEOUS

Plaintiff also seeks summary judgment under the FMA.  Plaintiff urges that if a foreign government fails to provide the Secretary of State with notification of its intent to sell real property in the United States, sale of the property to a United States citizen is void on its face.  Plaintiff's memorandum of law, pp. 10-11.  As a result, plaintiff claims that Shimoff's purchase of the Property from plaintiff was unlawful because plaintiff did not provide the Secretary of State with prior notification of its intent to sell the Property.  Plaintiff's memorandum of law, p. 11 ("The purchaser's act was 'unlawful.'")  Plaintiff is simply wrong, as plaintiff misrepresents, misreads, and misinterprets the FMA.

The FMA was enacted in 1982 as a tool to provide the United States Department of State with additional leverage to ensure reciprocity for United States missions in foreign countries, and to protect national security interests within the United States.  *See generally* Andrew L. Odell, *Enforcing Reciprocity in U.S. Diplomatic Relations: The Foreign Missions Act of 1982*, N.Y.U. J. Int'l L. & Pol. 817 (1985).  The statute was enacted for the benefit of the State Department in its interaction with foreign governments who are generally unfriendly, hostile, or fail to provide United States' foreign missions with appropriate assistance abroad.  *Id.*  Nothing in the legislative history of the FMA, nor any case law whatsoever, supports plaintiff's argument that the

14

FMA was enacted to permit the voiding of a transaction such as the sale of the Property from plaintiff to Shimoff, or the subsequent sale from Shimoff to Mezei.

A.    22 U.S.C. § 4305

In its memorandum of law, plaintiff quotes 22 U.S.C. § 4305(a), which provides that a foreign mission notify the Secretary of State before executing any contract for the purchase or sale of real property in the United States. *City of Englewood v. Socialist People's Libyan Arab Jamahiriya*, 773 F.2d 31 (3d Cir. 1985). Mezei does not dispute that Benin failed to notify the Secretary of State of its intention to sell the Property. There is nothing in the statute, however, that provides for divestiture of the Property by Shimoff if plaintiff fails to comply with the notice requirement.

Indeed, plaintiff's argument would permit a foreign government to use 22 U.S.C. § 4305(a) as both sword and shield. A foreign government could simply decide not to advise the Secretary of State of its intention to sell land, so that if it later transpired that the sale were a bad deal economically, the foreign government could use the same statute to recover the property from the innocent American purchaser. Congress cannot have intended this when it passed the FMA.

To the contrary, 22 U.S.C. § 4305(b), which plaintiff omits from its memorandum of law, provides:

15

§ 4305.   Property of foreign missions

. . . .

(b)      Divestiture

The Secretary [of State] may require any <u>foreign mission to divest itself of</u>, or forgo the use of, any real property determined by the Secretary –

(1) not to have been <u>acquired</u> in accordance with this section;

(2) to exceed limitations placed on real property available to a United States mission in the sending State; or

(3) where otherwise necessary to protect the interests of the United States.

(Emphasis added.)  The statute thus provides for divestiture as an option available to the

United States when the foreign mission <u>acquires</u> real property without giving notice

under 22 U.S.C. § 4305(a).  The statute does not, however, provide for divestiture where

the foreign mission <u>sells</u> real property without providing notice under 22 U.S.C. §

4305(a).  Moreover, even in the case of property acquired by a foreign mission, the

statute offers the remedy of divestiture only to the Secretary of State, not, for example, to

Congress or the judiciary.

It is a fundamental principal of statutory construction that, where the legislature

includes language in one section of a statute, and later excludes that language from a

subsequent section of the statute, the subsequent exclusion is intentional.  *See Russell v.*

16

*United States*, 464 U.S. 16, 23 (1983); *People v. Aubin*, 245 A.D.2d 805, 806-7, 666 N.Y.S.2d 778, 780 (3d Dep't 1997); *People v. Pena*, 169 Misc.2d 75, 81, 641 N.Y.S.2d 794, 798-99 (Sup. Ct. Bronx Co. 1996). Here, Congress wrote clearly that the purchase <u>and</u> sale of real property by a foreign mission are subject to the notification requirements of 22 U.S.C. § 4305(a) ("The Secretary shall require any foreign mission . . . to notify the Secretary prior to any proposed acquisition, or any proposed sale or other disposition."). Yet, when addressing the permissibility of divestiture, Congress referred <u>only</u> to property that has "been acquired" by a foreign mission, not property sold by a foreign mission. 22 U.S.C. § 4305(b). Since Congress elected specifically to provide the Secretary of State with a vehicle to divest a foreign mission of real property that it acquired without notification, but not a mechanism to divest a United States citizen of real property sold to him or her by a foreign mission, it is clear that Congress did not intend to impose the penalty on United States citizens.[8]

The logical explanation lies in Congress' goal in passing the FMA. Congress was concerned with ensuring reciprocity for Unites States missions abroad, and protecting national security interests within the United States. *See generally* Andrew L. Odell, *Enforcing Reciprocity in U.S. Diplomatic Relations: The Foreign Missions Act of 1982*. There is no potential harm to either goal if a United States citizen buys property from a

---

[8] During the September 18, 2006, and September 20, 2006, telephone conversations between Todd Harris Hesekiel, an associate of Ackerman, Levine, Cullen, Brickman & Limmer, LLP and Massey, Office Director of Real Estate Matters in the United States Foreign Missions Office, Massey confirmed that the FMA has never been applied in the manner in which plaintiff now seeks. Hesekiel Decl., ¶ 11.

foreign mission. If a foreign mission purchases real property in the United States,

however, and the acquisition is not subject to potential divestiture, the United States

would lose the very bargaining power that the FMA was enacted to provide. Moreover,

if a foreign mission elected to acquire property in a sensitive-security area and the United

States was unable to void the transaction, the Congressional goal of protecting national

security would be impossible to achieve. These same concerns do not exist when dealing

with a foreign mission's sale of real property to a United States citizen.

Shimoff's purchase of the Property is not a transaction subject to divestiture under

the FMA. Moreover, even if the transaction were subject to divestiture under the FMA,

22 U.S.C. § 4305 provides that only the Secretary of State has the power to enforce such

divestiture, not Congress or the judiciary.

   B.   22 U.S.C. § 4311

Plaintiff also argues that 22 U.S.C. § 4311(a) criminalizes a United States

citizen's purchase of property from a foreign mission, if the Secretary of State does not

receive prior notification of the foreign mission's intent to enter into the transaction.

Plaintiff is wrong.

22 U.S.C. § 4311(a) states that "It shall be unlawful for any person to make

available any benefits to a foreign mission contrary to this chapter." Apparently, plaintiff

reads "benefits" to include transactions in which a person purchases property from a

18

foreign mission. In so doing, plaintiff ignores the statutory definition of the term

"benefits" provided in 22 U.S.C. § 4302(a)(1):

> § 4302. Definitions
>
> (a) For purposes of this chapter –
>
> > (1) "benefit" (with respect to a foreign mission) means any acquisition, or authorization for an acquisition, in the United States by or for a foreign mission, including the acquisition of –
> >
> > > (A) real property by purchase, lease, exchange, construction, or otherwise . . . .

Thus, read in conjunction with Section 4302(a)(1), Section 4311(a) makes it

unlawful for any person to make available any property to a foreign mission for that

foreign mission to purchase without prior compliance with 22 U.S.C. § 4305. The statute

does not criminalize an individual's purchase of property from a foreign mission, even if

the foreign government did not comply with 22 U.S.C. § 4305. As a result, Section

4311(a) has no bearing on the transaction at issue, and plaintiff's reliance on the statute

is erroneous.[9]

---

[9] Plaintiff also cites 22 U.S.C. § 4311(b). This section says that a purchaser of property from a foreign mission may ask the Secretary of State whether there has been compliance by a foreign mission with the notice requirements of 22 U.S.C. § 4305. The statute does not, however, make this query a requirement, nor does the statute provide for any penalty if a private citizen does not seek advice from the Secretary of State.

<u>POINT IV</u>

<u>PLAINTIFF'S INTERPRETATION AND PROPOSED
APPLICATION OF RPL § 331 ARE ERRONEOUS</u>

Plaintiff urges that RPL § 331 requires that a document authorizing a person to enter into real property transactions on behalf of a foreign government be filed with the county clerk or register, before the authorized person may enter into such transaction. Again, plaintiff is mistaken.

RPL § 331 states that recordation of a document granting a person authority to enter into real property transactions on behalf of a foreign government "shall be presumptive evidence of the authority of such [person]."[10] The statute does not impose an affirmative duty on a foreign government to record such documentation. Nor does it suggest that the absence of recordation renders a transaction entered into by an authorized person void, or even voidable. The statute simply provides one method of notifying others that the person with whom they are doing business has authority to bind the government whom he claims to represent. There are other ways that this may be done.[11] Therefore, RPL § 331 is not dispositive of this case.

_____

[10] The full text of RPL § 331 is found in plaintiff's memorandum of law at pp. 9-10.

[11]  Plaintiff's memorandum of law contains three "suggestions" as to how an individual wanting to do business with a foreign government may determine if the foreign government's representative has authority to conduct such business. The list suggested by plaintiff is in no way exhaustive. Surely, one can confirm the authority of an individual by conversations with others, including, of course, the attorney who actually represented the foreign government in the underlying transaction. In this case, the Koller Letter and Koller Decl. confirm that this is exactly how Shimoff determined Guedegbe's authority.

CONCLUSION

For the foregoing reasons, plaintiff's motion should be denied.

Dated:  October 20, 2006

ACKERMAN, LEVINE, CULLEN,
BRICKMAN & LIMMER, LLP

By:_____
Todd Harris Hesekiel (TH-1289)

Attorneys for Plaintiff
175 Great Neck Road
Great Neck, New York  11021
    (516) 829-6900

John M. Brickman
Todd Harris Hesekiel

On the Brief

201803

21