UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────────

REPUBLIC OF BENIN,

               Plaintiff,

      - against –

BEVERLY MEZEI, et al.,

             Defendants.
────────────────────────────────────

**06 Civ. 870 (JGK)**

**OPINION AND ORDER**

JOHN G. KOELTL, District Judge:

This case involves a dispute over a plot of land located in Bronx County (the "Lot"). The Lot, at least at one time, was a back lot to the residence of the Ambassador to the Republic of Benin's United Nations Mission in New York. In October 2004, the land was purportedly sold to the defendant Robin Shimoff. The plaintiff, the Republic of Benin, alleges that the sale of the property to the defendant was unauthorized and seeks to void the transaction. Benin also seeks to void a subsequent deed, executed by Shimoff, conveying the Lot to the defendant Beverly Mezei.

Benin has moved for summary judgment against the defendants Shimoff and Mezei primarily on two grounds.[1] First, Benin argues that the deed that purported to convey the property to Shimoff

---

[1] The plaintiff has also named the Register of the City of New York and the City of New York in this action. However, the plaintiff has not sought summary judgment against these defendants, and these defendants take no position on the present motion. As such, for the purposes of this motion, the term "defendants" refers only to the defendants Shimoff and Mezei.

was forged and is therefore void.  Second, Benin argues that the
conveyance to Shimoff was invalid under the Foreign Missions
Act, 22 U.S.C. §§ 4301-4316.[2]  The Court has jurisdiction of this
matter pursuant to 28 U.S.C. §§ 1331 (federal question
jurisdiction) and 1332(a)(4) (diversity jurisdiction between a
foreign state and citizens of a State or of different States).
For the reasons discussed below, the plaintiff's motion for
summary judgment is **denied**.

## I.

On October 1, 2004, a deed was executed between the
"REPUBLIC OF BENIN (formerly Republic of Dahomey) by THOMAS
GUEDEGBE, Director of Administration, Ministry of Foreign
affairs, Republic of Benin" and the defendant Robin Shimoff.

---

[2] In its reply brief, the plaintiff raised—for the first time—an
argument under the Vienna Convention on Diplomatic Relations, Apr. 18,
1961, 23 U.S.T. 3227 ("Vienna Convention").  Because the plaintiff's
argument was raised for the first time in its reply brief, the
argument will not be considered.  See Playboy Enter., Inc. v. Dumas,
960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) ("Arguments made for the
first time in a reply brief need not be considered by a court.")
(collecting cases); see also Cioffi v. Averill Park Cent. Sch. Dist.
Bd. of Educ., 444 F.3d 158, 169 (2d Cir. 2006) (deeming waived an
issue raised for the first time in a reply brief).  However, it is
unlikely, even were the Court to consider the argument, that the
plaintiff's claim under the Vienna Convention would entitle it to
summary judgment.  The plaintiff argues that the inviolability of
Benin's foreign mission under the Vienna Convention precludes the
unauthorized transfer of its property.  However, even assuming Benin's
premise is correct, as discussed below there are genuine issues of
material fact as to whether the transaction involving Benin's property
was in fact unauthorized.  Therefore the plaintiff would not be
entitled to summary judgment on this point.

(See Aff. of Stanley Fischer, dated July 21, 2006 ("7/21/06

Fischer Aff."), Ex. 1-B (Ex. B to the Am. Compl.); Pl.'s

Statement of Material Facts on Mot. for Summ. Judg. Pursuant to

Local Rule 56.1 ("Pl.'s 56.1 Stmt.") ¶ 4;  Defendant Mezei's

Counterstatement Pursuant to Local Rule 56.1 ("Defs.' 56.1

Stmt.")[3] ¶ 4.)  The deed purported to convey a plot of land

located in Bronx County, Block 5821, Lot 2804, to the defendant

Shimoff.  (See 7/21/06 Fischer Aff., Ex. 1-B; Pl.'s 56.1 Stmt. ¶

2; Defs.' 56.1 Stmt. ¶ 2.)  Public records reveal that Shimoff

paid $650,000 for the Lot.  (See Decl. of Todd Harris Hesekiel,

dated Oct. 20, 2006 ("10/20/06 Hesekiel Decl."), ¶ 2(iii), Ex.

A; Decl. of Edward R. Finklestein, dated Oct. 20, 2006

("10/20/06 Finklestein Decl."), Ex. D.)  A year later, on

October 11, 2005, Shimoff executed a deed with the defendant

Mezei, purporting to convey the Lot to Mezei for $1,250,000.

(10/20/06 Finkelstein Decl., Ex. E; Decl. of Beverly Mezei,

dated Sept. 29, 2006 ("Mezei Decl."), ¶¶ 2-3, attached to

10/20/06 Hezekiel Decl.)

It is undisputed that Benin formerly owned the land.  The

Republic of Dahomey (now the Republic of Benin) acquired the Lot

in a deed dated March 25, 1963.  (See 7/21/06 Fischer Aff., Ex.

A.)  The Republic of Benin is a Member State of the United

---

[3] Shimoff adopted Mezei's Rule 56.1 Statement as her own.
Therefore, Mezei's Rule 56.1 statement will be considered as that of
both defendants for the purposes of this motion.

Nations ("U.N."). (Pl.'s 56.1 Stmt. ¶ 1; Defs.' 56.1 Stmt. ¶ 1.) The Lot constituted a back lot to the personal residence of Benin's Ambassador to its United Nations Mission in New York. (Am. Compl. ¶ 9.) The central dispute in this case centers on the question of who presently owns Lot 2804. (See Pl.'s 56.1 Stmt. ¶ 2; Defs. 56.1 Stmt. ¶ 2.)

Benin asserts, through its current Minister of Foreign Affairs, that no person was authorized to sell the Lot on Benin's behalf. (Statement of Mariam Aladji Boni Diallo, dated June 9, 2006 ("Diallo Stmt."), attached to 7/21/06 Fischer Aff.)[4] As such, according to Benin, the individual who signed the deed, Thomas Guedegbe, was acting without authority to enter into the transaction conveying Lot 2804. Benin claims that "[a]ny deed or agreement conveying the property constitutes a forgery with regard to Benin law." Id. Benin claims that it is prosecuting Thomas Guedegbe for engaging in the transaction at issue in this case, and that he is currently in detention pending trial. Id.

It is undisputed that no document granting Guedegbe authority to enter into the transaction was recorded with the

_____

[4] The defendant Mezei objects to the Diallo Statement, arguing that it fails to comply with 28 U.S.C. § 1746 and Federal Rule of Evidence 902(3). (Mezei's Mem. of Law in Opp. to Pl.'s Mot. for Summ. Judg. at 10 n.5.) The plaintiff has offered no adequate response to this objection. However, the Court need not resolve this issue. As discussed below, even assuming the Diallo Statement is admissible, the Court finds that there are genuine issues of material fact that preclude a grant of summary judgment.

county clerk or register pursuant to New York Real Property Law
§ 331.  It is also undisputed that Benin never notified the
Secretary of State that it intended to sell Lot 2804, as
required by the Foreign Missions Act.  Finally, it is undisputed
that Thomas Guedegbe was the person who actually signed the
October 1, 2004 deed as "THOMAS GUEDEGBE" on behalf of Benin;
the plaintiff concedes that Guedegbe executed the October 1,
2004 deed.  (Pl.'s 56.1 Stmt. ¶¶ 4, 6, 8; Defs.' 56.1 Stmt. ¶¶
4, 6, 8.)

The defendants, however, dispute Benin's contention that
Guedegbe lacked authority to convey the property on behalf of
Benin.  (See Defs.' 56.1 Stmt. ¶¶ 3, 5.)  The attorney who
allegedly represented the Republic of Benin during the October
2004 sale of the property stated that Rogetien Biaou, then
Foreign Minister of the Republic of Benin, told him that the
Beninese government authorized the transaction and that Thomas
Guedegbe was authorized to execute all the relevant transaction
documents.  (Decl. of Alfred Koller, dated Sept. 29, 2006
("Koller Decl."), attached to 10/20/06 Hesekiel Decl.)

The parties dispute whether Biaou himself, given his
position as a Foreign Minister, had the power to dispose of the
property on behalf of Benin.  (See 10/20/06 Hezekiel Decl. ¶ 7;
Decl. of Stanley H. Fischer, dated Nov. 13, 2006 ("11/13/06
Fischer Decl."), ¶ 4.)  The defendant Mezei, for example,

presents a letter from a Consulate Officer of Benin to the plaintiff's counsel that states:  "The Government of Benin has engaged the responsibility of the former Ambassador and the former Minister of Foreign Affairs in the case because the property is under their authority."  (Letter from Karimou Alfa Zerandouro to Stanley Fischer, dated Sept. 14, 2006, attached as Ex. E to 10/20/06 Hezekiel Decl. (emphasis added).)  The plaintiff, on the other hand, presents excerpts from Benin law, which allegedly show that Biaou, as then Minister of Foreign Affairs and African Integration, was not responsible for the property.  (11/13/06 Fischer Decl. ¶ 4, Ex. D.)

The plaintiff also offers evidence to rebut the defendants' claim that Biaou authorized Thomas Guedegbe to execute the October 1, 2004 deed.  The plaintiff submits an "Affidavit of Non Transfer" of Biaou, in which Biaou states that the property "has never been subject to any transfer to any party or person by the State of Benin."  (11/13/06 Fischer Decl., Ex. H.)  However, Biaou's affidavit is cryptic.  After stating that the property had never been subject to any transfer, Biaou concludes:  "Therefore, this deed has been signed and stamped with the seal of the Republic of Benin."  Id.  It is unclear to what "deed" Biaou's statement refers, and it is unclear if the document is in fact a sworn statement by Biaou.

Finally, the defendant Mezei, who claims present ownership

of the Lot pursuant to the October 11, 2005 deed executed by
Shimoff, states that she had no knowledge of any fraudulent
intent on the part of Shimoff or of any other fraud in the chain
of title.  (Mezei Decl. ¶ 4.)  She states:  "In fact, when I
purchased the property, I believed that Shimoff had good title
to it."  <u>Id.</u>

## II.

The standard for granting summary judgment is well
established.  Summary judgment may not be granted unless "the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477
U.S. 317, 322 (1986); <u>Gallo v. Prudential Residential Servs.</u>
<u>Ltd. P'ship</u>, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial
court's task at the summary judgment motion stage of the
litigation is carefully limited to discerning whether there are
genuine issues of material fact to be tried, not to deciding
them.  Its duty, in short, is confined at this point to issue-
finding; it does not extend to issue-resolution."  <u>Gallo</u>, 22
F.3d at 1224.  The moving party bears the initial burden of
informing the district court of the basis for its motion and

identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. T.R.M. Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its initial burden of showing a lack of a material issue of fact, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City

of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998).

## III.

The plaintiff first claims that the October 1, 2004 deed purporting to convey the Lot to Shimoff was a forgery and therefore void.  Under New York law, it is well established that "[a] forged deed is void and conveys no title."[5]  Yin Wu v. Wu, 733 N.Y.S.2d 45, 46 (App. Div. 2001).  Moreover, because a forger has no title to convey, a person cannot be a bona fide purchaser through a forged deed.  Id.  New York Real Property Law § 266, which states the standard for achieving bona fide purchaser status, applies to situations involving fraud, in which the deed is voidable, but does not apply to void transactions, such as those involving forgery.  Id.  Finally, the act of recording cannot validate a forged deed.  Marden v. Dorthy, 54 N.E. 726, 731 (N.Y. 1899).  The defendants do not dispute any of these principles.  Rather, the defendants disagree with the plaintiff's contention that Thomas Guedegbe's signature on behalf of Benin constituted a forgery under New

---

[5] Based on the arguments in the briefs, the parties seem to agree that New York law applies to this issue.  As such, the Court accepts the parties' agreement and will apply New York law.  See Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc., 187 F.3d 229, 239 n.4 (2d Cir. 1999); Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989).

York law.

The plaintiff relies on the New York Penal Law definition of "forgery" to argue that Guedegbe's actions constitute a forgery.  New York Penal Law § 170.10 provides in relevant part that

> [a] person is guilty of forgery in the second degree when, with the intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument which is or purports to be... a deed... or other instrument which does or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status...

The phrase "falsely makes" is defined as follows:

> A person "falsely makes" a written instrument when he makes or draws a complete written instrument in its entirety, or an incomplete written instrument, which purports to be an authentic creation of its ostensible maker or drawer, but which is not such either because the ostensible maker or drawer is fictitious or because, if real, he did not authorize the making or drawing thereof.

New York Penal Law § 170.00.  The plaintiff argues that Guedegbe signed in the name of Benin and not in his individual capacity.  Therefore, according to the plaintiff, Benin is the "ostensible maker."  Because Benin is the "ostensible maker" and did not "authorize the making" of the deed by Guedegbe, the plaintiff concludes that Guedegbe's signature on behalf of Benin is a forgery under New York law.

The plaintiff's argument is foreclosed by the decision of the New York Court of Appeals in People v. Cunningham, 2 N.E.2d

891 (N.Y. 2004).  Cunningham squarely confronted the question of whether a false or misrepresented agency endorsement constitutes a forgery under New York Penal Law § 170.10.  The unanimous Court of Appeals explained that "it is not forgery for a person to sign his own name to an instrument, and falsely and fraudulently represent that he has authority to bind another by doing so and the signer is guilty of false pretenses only." Cunningham, 2 N.E.2d at 894 (citation omitted).

The court in Cunningham relied in part on its earlier decision in People v. Levitan, 399 N.E.2d 1199 (N.Y. 1980), which arose under a prior but materially indistinguishable version of the forgery statute.[6]  Cunningham, 813 N.E.2d at 893. In Levitan, the defendant signed three documents purporting to be deeds transferring the title to certain real property.  399 N.E.2d at 1200.  The defendant signed her own name to the documents.  Id.  She never suggested or represented that she was anybody other than herself.  Id.  The defendant signed one of the deeds as an individual grantor, and the other two as the officer of a corporate grantor.  Id.  However, in fact, neither the defendant nor the corporate grantors actually owned title to the property that she purported to transfer.  Id.

_____

[6] As the court explained in Cunningham, the legislature merely updated the forgery statute to cover certain technological advances but did not abrogate the classic approach to forgery outlined in Levitan.  813 N.E.2d at 893.

The court in <u>Levitan</u> found that the defendant's action did not constitute forgery.  <u>Id.</u>  The court explained that "a distinction must be drawn between an instrument which is falsely made, altered or completed, and an instrument which contains misrepresentations not relevant to the identity of the maker or drawer of the instrument."  <u>Id.</u>  The court further explained that "in each case, there can be a forgery only if the actor is not the ostensible maker or drawer of the instrument <u>and</u> is not authorized by that person to either make, complete or alter the instrument."  <u>Id.</u> at 1201 (emphasis added).  Finally, the court acknowledged that "while it is true that in certain rare instances one may commit a forgery by signing one's own name, this is so only where the signing is done in such a way as to deceive others into believing that the signer is in fact some third party."  <u>Id.</u> at 1200.

In <u>Cunningham</u>, an agent of a corporation signed his own name to a corporate check, in excess of his authority.  2 N.E.2d at 892–93.  The parties in that case—like the parties here—disagreed as to who the "ostensible maker" of the check was. <u>Id.</u> at 894.  The prosecution argued that the corporation was the ostensible maker because the corporation's name appeared on the check as the owner of the account.  The defendant, on the other hand, argued that, having signed his own name, he was both the actual maker and the ostensible maker of the check and that he

12

was not guilty of forgery because he never pretended to be anybody other than himself.  Ultimately, the court agreed with the defendant, explaining that "when an individual signs a name to an instrument and acknowledges it as his own, that person is the 'ostensible maker.'"  Id. (quoting People v. Briggins, 406 N.E.2d 766 (N.Y. 1980)).  The Court held:  "We conclude that authority and authenticity are not the same thing.  Defendant did not commit forgery merely by exceeding the scope of authority delegated by the corporation."  Id. at 895.

In this case, the deed for Lot 2804 was signed by Thomas Guedegbe.  There is no allegation that Thomas Guedegbe did not in fact sign the deed.  There is no allegation that Thomas Guedegbe represented that he was anybody other than himself.  Rather, the plaintiff's argument rests solely on its position that Benin was the ostensible maker because Guedegbe signed "on behalf of" Benin and that Guedegbe was not actually authorized to sign on Benin's behalf.  However, applying Cunningham, Guedegbe, as the person who signed and acknowledged the instrument, was the ostensible maker of the deed.  The issue here is one of authority, not authenticity, and thus presents a classic example of an alleged fraudulent agency endorsement, which does not constitute a forgery under New York law.[7]

---

[7] The plaintiff argues that a finding that Guedegbe's actions did not constitute forgery would lead to the ludicrous result that any unauthorized officer of a sovereign nation could bind a state to a

Even if the plaintiff's reading of the statute were correct and Benin—not Guedegbe—was the ostensible maker, there would still be a genuine issue of material fact as to whether Benin "authorized the making" of the deed by Guedegbe.  Although the plaintiff steadfastly denies that Guedegbe was acting within the scope of his authority, the defendants have presented sufficient evidence to raise an issue of fact as to whether Guedegbe's actions were actually authorized by Benin through Rogetien Biaou, who was the Foreign Minister of the Republic of Benin during the relevant time period.  The attorney that allegedly represented Benin during the transaction stated that Biaou informed him that Benin authorized the sale of Lot 2804 and that

---

real estate transaction, without committing forgery, by merely signing a document "on behalf of" the nation.  Specifically, the plaintiff argues that if the defendants' view is correct, "then any attorney (as officer of the Court or Judge) could convey good title to the federal courthouse by merely signing his name on a deed on behalf of the United States Government."  (Pl.'s Reply Mem. of Law at 8.)  The plaintiff's fears are misplaced.  First, anyone who enters into an arrangement with the federal government takes the risk of having accurately ascertained that the purported government agent has stayed within the bounds of the agent's authority.  "[T]he [federal] Government is not bound by the acts of its agents which exceed the scope of those agents' actual authority."  DeRoo v. United States, 12 Cl. Ct. 356, 360 (Cl. Ct. 1987) (citing Federal Crop Ins. Corp. v. Merrill, 232 U.S. 380, 384 (1947)).  Second, there are other principles of New York law—apart from the plaintiff's forgery theory— that militate against the ability of an agent to convey voidable title to a principal's land without the principal's authorization.  For example, the authority of an agent to convey an estate in real property must be in writing.  See N.Y. General Obligations Law § 5- 703.  However, these other provisions of New York law have not been briefed on this motion and could not form the basis for summary judgment.  Finally, before a purchaser attempted to pay for a federal courthouse and claim that he or she was a good faith purchaser without notice of a prior fraud, the purchaser would be well served to confirm the bona fides and authorization of the seller.

14

Guedegbe had the authority to execute the relevant documents on Benin's behalf.  There is an issue, therefore, as to whether the transaction was authorized by Biaou on Benin's behalf.

There is also a factual dispute as to whether Biaou, as Foreign Minister, had the authority to act on Benin's behalf with respect to the property and to authorize the transaction. Although the plaintiff claims that Biaou lacked any such authority, the defendants present evidence suggesting that Biaou was in fact responsible for the property, including a letter from a Consulate Officer of Benin stating that the property was under Biaou's authority.  Viewing the facts in the light most favorable to the nonmoving parties, a rational trier of fact could conclude that Biaou had the power to authorize the transfer of the property and that Biaou actually authorized Guedegbe to enter into the transaction.[8]

---

[8] The plaintiff highlights the undisputed fact that Benin never certified and recorded any legislative decree or executive order granting Thomas Guedegbe the power or authority to enter into the transaction on behalf of Benin as provided by § 331 of the New York Real Property Law.  However, § 331 provides merely that such documents "shall be presumptive evidence of the authority of such agent or attorney."  Nothing in § 331 suggests that the certification and recording of such a legislative decree or executive order is required for foreign countries to enter into real estate transactions through its agents in the state.  More importantly, nothing in the statute suggests that the lack of a certified and recorded legislative decree or executive order renders any such transaction void.  Although there are provisions of New York law that outline the requirements for the formation of a valid power of attorney, see N.Y. General Obligations Law § 5-703, and that discuss the capacity of foreign governments to hold property in the state, see N.Y. Real Prop. Law § 10, the plaintiff has not cited to or discussed the applicability of these provisions in its present motion for summary judgment.

Finally, it is impossible to determine at this point, based on the evidence before the Court, whether Guedegbe acted with the requisite "intent to defraud," which is a necessary element of forgery under the statute on which the plaintiff relies.  The issue of whether Guedegbe possessed the requisite fraudulent intent is an issue of fact that cannot be resolved on this motion.  See Citizens Bank of Clearwater v. Hunt, 927 F.2d 707, 711 (2d Cir. 1991).  The plaintiff has failed to demonstrate that there is no genuine issue of fact as to Guedegbe's intent.

For all of these reasons, the plaintiff is not entitled to summary judgment on the grounds that the October 1, 2004 deed purporting to convey the Lot to Shimoff was a forgery and therefore void.

## IV.

The plaintiff next seeks relief under the Foreign Missions Act ("FMA"), 22 U.S.C. §§ 4301–4316.  The plaintiff relies on two provisions of the FMA.  First, the plaintiff relies on § 4305, which provides in part that "[t]he Secretary [of State] shall require any foreign mission... to notify the Secretary prior to any proposed acquisition or any proposed sale or other disposition, of any real property by or on behalf of such mission."  § 4305(a)(1).  Benin's argument seems to be that because it is undisputed that it failed to notify the Secretary

of State about the sale of the Lot, the Court should declare the transfer of Lot 2804 void.  Second, the plaintiff relies on § 4311, which makes it "unlawful for any person to make available any benefits to a foreign mission contrary to this chapter...."  § 4311(a).  Benin argues that the defendant Shimoff's purchase of the Lot was a "benefit" to Benin, which was contrary to the FMA because Benin never notified the Secretary prior to the proposed sale.  Then, relying on its premise that Shimoff's actions were unlawful, the plaintiff draws the conclusion that the deed is void and that good title did not pass to either of the defendants.

The plaintiff's arguments have no merit.  The plaintiff's arguments ignore relevant portions of the statute, misconstrue the purpose underlying the statutory scheme, and seek relief that plainly impinges on the executive's broad discretionary authority to enforce compliance with the FMA.

### A.

The Foreign Missions Act was created in part to address and cure imbalances between the treatment of United States missions operating abroad and the treatment of foreign missions within the United States.  See United States v. D.C. Bd. of Zoning Adjustment, 644 A.2d 995, 997 (D.C. 1994).  By way of background, the Senate Report accompanying the original

legislation explained that "[i]n an increasing number of countries, the United States is denied suitable locations for our missions or long-term rights to property or facilities, often resulting in diminished security, excessive or discriminatory costs, or inadequate facilities which significantly reduce the effectiveness of our missions." S. Rep. No. 97-329, at 2 (1982), as reprinted in 1982 U.S.C.C.A.N. 714, 715.  These concerns about inequitable treatment and the policy of reciprocity underlying the FMA are embodied in the congressional declaration of findings and policy:

> The Congress declares that it is the policy of the United States to support the secure and efficient operation of United States missions abroad, to facilitate the secure and efficient operation in the United States of foreign missions... and to assist in obtaining appropriate benefits, privileges, and immunities for those missions... and to require their observance of corresponding obligations in accordance with international law.

22 U.S.C. § 4301(b).

   As a solution, Congress created a statutory scheme that vests broad discretion in the Secretary of State to exercise authority over foreign missions in light of these foreign policy considerations and concerns.  See Palestine Information Office v. Shultz, 853 F.2d 932, 936 (D.C. Cir. 1988).  Specifically, the FMA provides that

> [t]he treatment to be accorded to a foreign mission in the United States shall be determined by the Secretary

> after due consideration of the benefits, privileges,
> and immunities provided to missions of the United
> States in the country or territory represented by that
> foreign mission, as well as matters relating to the
> protection of the interests of the United States.

22 U.S.C. § 4301(c); see also 22 U.S.C. § 4303 (listing the

functions of the Secretary under the FMA and stating that the

Secretary shall "[p]erform such other functions as the Secretary

may determine necessary in furtherance of the policy of this

chapter").  The FMA then provides mechanisms for the Secretary

to restrict or provide benefits to foreign missions in the

United States, bounded only by the broad discretion granted by

the FMA.  See, e.g., § 4304(b) (providing that, where necessary,

the Secretary may require a foreign mission "to obtain benefits

from or through the Secretary on such terms and conditions as

the Secretary may approve" or "to forego the acceptance, use, or

relation of any benefit or to comply with such terms and

conditions as the Secretary may determine as a condition to...,"

among other things, "the acquisition, retention, or use of any

real property...").


## B.

Section 4305, among other things, imposes a reporting

requirement on foreign missions that wish to purchase or sell

real property in the United States.  Again, § 4305(a)(1)

provides in relevant part:  "The Secretary shall require any

19

foreign mission... to notify the Secretary prior to any proposed acquisition, or any proposed sale or other disposition, of any real property by or on behalf of such mission...."  The foreign mission or a party acting on the foreign mission's behalf may only proceed with the proposed transaction after the expiration of a 60-day waiting period (unless the Secretary approves a shorter period), which begins on the date notice is provided to the Secretary, and only if the Secretary has not disapproved of the proposal.  § 4305(a)(1)(A)-(B).  If the Secretary disapproves of the proposal, the Secretary "may include in such a notification such terms and conditions as the Secretary may determine appropriate in order to remove the disapproval." § 4305(a)(1)(B).

Subsection (b) then provides a specific enforcement mechanism to ensure compliance with § 4305.  If the Secretary determines that any real property is not "acquired in accordance with this section," then "[t]he Secretary may require any foreign mission to divest itself, or forgo the use of" such real property.  § 4305(b).[9]

Benin argues that it is entitled to relief under § 4305 of the FMA.  It is undisputed that Benin never notified the

_____

[9] Section 4305(b) also allows the Secretary to "require a foreign mission to divest itself of, or forgo the use of, any real property" that "exceed[s] limitations placed on real property available to a United States mission in the sending state" or "where otherwise necessary to protect the interests of the United States."

Secretary of State of the proposed sale to the defendant
Shimoff.  Therefore, Benin seems to argue, in essence, that
because of its own failure to comply with the statute, the Court
should declare the purported transfer of the property to Shimoff
void.  The plaintiff's argument is without merit.

In analyzing a statute, the Court begins with the text and
plain meaning of the statute, if it has one.  See Green v. City
of New York, 465 F.3d 65, 78 (2d Cir. 2006) (quoting Gottlieb v.
Carnival Corp., 436 F.3d 335, 337 (2d Cir. 2006)).  The Court
will resort to canons of construction "[o]nly if an attempt to
discern the plain meaning fails because the statute is
ambiguous."  Id.  Finally, if canons of construction do not
resolve the ambiguity, the Court will turn to legislative
history as an interpretive guide.  Id.

In this case, the statute cannot support the meaning that
the plaintiff ascribes to it.  Nothing in the language of
§ 4305(a) provides a basis for the judicial relief the plaintiff
seeks.  First, the statute plainly applies only as a means to
require foreign missions to comply with the notification statute
and not as a means to be used by a foreign mission to invalidate
a transaction.  Section 4305(a) burdens foreign missions with a
requirement that they provide notice to the Secretary of State
prior to entering into any real estate transaction.  The statute
does not require private citizens to provide such notice to the

Secretary of State.  Consistent with the broader statutory
scheme, this notification requirement provides the Secretary
with a mechanism to monitor and regulate the activities of
foreign missions operating within the United States.[10]  The
plaintiff points to no language in § 4305 or elsewhere to
suggest that the statute could by used by a foreign mission to
invalidate a transaction where no notice is provided to the
Secretary of State.

As a practical matter, such a veto power would potentially
undercut the purpose of the notification requirement in
§ 4305(a) by creating a disincentive for foreign missions to
provide notice to the Secretary of proposed real estate
transactions.  Under the plaintiff's reading of the statute, a
foreign mission could simply ignore the notification requirement
of § 4305(a) and then, if the transaction later proved
unfavorable, seek to have a court void the transaction.
Statutes should be interpreted to avoid absurd results.  See
United States v. Dauray, 215 F.3d 257, 264 (2d Cir. 2000).

---

[10] For example, apart from monitoring to ensure reciprocal
treatment for United States missions operating abroad, § 4305 contains
features to protect national security interests and guard against
hostile foreign intelligence activities.  See § 4305(d) (providing
that the Secretary of State shall inform the Secretary of Defense and
the Director of the Federal Bureau of Investigation after receiving
notice of a foreign mission's proposed real property transaction in
order for them to determine (after consultation with the Secretary of
State) whether the acquisition of the property might substantially
improve hostile intelligence activities).  This subsection was added
as part of the 1987 amendments to the statute.  See Act of Dec. 22,
1987, Pub. L. No. 100-204, 101 Stat. 1331.

Moreover, the express enforcement mechanism in the statute plainly precludes the Court from granting the relief that the plaintiff seeks.  The enforcement of § 4305, consistent with the rest of the FMA, is committed to the sound discretion of the Secretary of State.  Section 4305(b) provides that the "Secretary may require" a foreign mission to divest itself of property not "acquired in accordance with this section."  The statute thus provides the Secretary, not the Court, with the discretionary power to enforce compliance with this section.

Additionally, the language creating the Secretary's divestiture power applies only to foreign missions.  No language authorizes the Secretary to divest a private citizen of real property.  It is therefore far from clear that this section provides the Secretary with authority to divest a private citizen who is unassociated with any foreign mission of real property acquired from a foreign mission.

Also, the Secretary's divestiture power applies to property found "not to have been acquired in accordance with this section."  § 4305(b)(1) (emphasis added).  The divestiture power thus does not appear to apply to sales of property by a foreign mission.  Although the Secretary has broad discretion under the statute, the language of the statute does not appear to provide for divestiture over land sold by a foreign mission, because once the foreign mission sells the land, and thus no longer owns

23

it, there is nothing left to divest from the foreign mission.

It would be consistent with the rest of the statutory scheme for
the Secretary's divestiture power only to apply to the
acquisition of and not the sale of real property.  The
Government's interest in ensuring reciprocity and protecting
national security interests may be diminished in situations
where the foreign government is selling rather than buying real
property.  Regardless, again, discretion to exercise the
divestiture power lies with the Secretary, not the Court.

In sum, § 4305 cannot be read to provide a judicial remedy
to void this real estate transaction based on the plaintiff's
own noncompliance with the notification provision of this
statute.[11]

### C.

The plaintiff also seeks relief under § 4311 of the FMA.
Section 4311(a) states that "[i]t shall be unlawful for any
person to make available any benefits to a foreign mission
contrary to this chapter."  The plaintiff then points out that a
"benefit" with respect to a foreign mission includes the

---

[11] Although the plaintiff is not entitled to relief based on its
own noncompliance with the statute, it may be that the fact that Benin
did not provide notice to the Secretary of State is some evidence that
the transaction was not in fact authorized by Benin, particularly if
Benin can show a past practice of providing such notice.  This,
however, is of course a separate question from whether the statute
provides Benin with a judicial remedy to void the transaction.

acquisition of "real property by purchase, lease, exchange, construction, or otherwise," § 4302(a)(1)(A), and the acquisition of "financial and currency exchange services," § 4302(a)(1)(G), both of which the plaintiff argues applies here.  The plaintiff argues that the defendant Shimoff's purchase of the property from Benin provided a "benefit" to Benin, as that term is defined, and that the benefit was contrary to § 4305(a) because no notice of the transaction was ever provided to the Secretary of State.  The plaintiff points out that § 4311(b) provides a mechanism for a private individual wishing to transact business with a foreign mission to determine whether the transaction is prohibited by any regulation or determination of the Secretary.  The plaintiff argues that, under § 4311(b), the defendant Shimoff could have checked to ensure that Benin had complied with the notification requirements of § 4305(a) prior to entering into the transaction.  As a result of Shimoff's allegedly "unlawful act," the plaintiff seeks to have the transaction voided.

This argument is also without merit.  The definition of "benefit" means "any acquisition, or authorization for an acquisition, in the United States by or for a foreign mission, including the acquisition of..." various specifics, several of which the plaintiff relies upon.  § 4302(a)(1).  As to the first alleged "benefit" that Shimoff provided to Benin, this

25

transaction involved the alleged <u>sale</u> of real property by a foreign mission and not the "<u>acquisition</u>... by or for a foreign mission" of "real property by purchase, lease, exchange, construction, or otherwise."  <u>See</u> § 4302(a)(1)(A) (emphasis added).  Second, the plaintiff's argument that Shimoff provided a "benefit" to Benin because he purchased property from Benin and therefore provided "financial and currency exchange services," § 4302(a)(1)(G), to Benin is an unreasonable reading of the statute.  As such, Shimoff did not provide a "benefit" to a foreign mission, and thus necessarily cannot be said to have provided a benefit to a foreign mission "contrary to this chapter," § 4311(a).

Finally, Benin's reliance on § 4311(b) is unwarranted. While § 4311(b) provided a means for Shimoff to have inquired whether the proposed sale of the property was prohibited by any regulation or determination of the Secretary of State under the FMA, there was no requirement that he do so and there is no provision of the statute that voids the sale because he did not do so.

For these reasons, the plaintiff is not entitled to relief under § 4311.

## CONCLUSION

For all of the reasons discussed above, the plaintiff's motion for summary judgment is **denied**.

SO ORDERED.

Dated: New York, New York
     March 21 , 2007

                              John G. Koeltl
                 United States District Judge

27

## CONCLUSION

For all of the reasons discussed above, the plaintiff's motion for summary judgment is **denied**.

SO ORDERED.

Dated: New York, New York
       March 21, 2007

_____
John G. Koeltl
United States District Judge

27