**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**REPUBLIC OF BENIN,**

                 Plaintiff,

       - against –

**BEVERLY MEZEI, et al.,**

                 Defendants.

---

**06 Civ. 870 (JGK)**

**OPINION AND ORDER**

**JOHN G. KOELTL, District Judge:**

## INTRODUCTION

This case involves a dispute over a plot of land (the "Lot") owned by the Republic of Benin ("Benin" or the "plaintiff"). As discussed in the Court's earlier opinions in this case, officials of Benin purported to sell the Lot in 2004 to Robin Shimoff for $650,000. See Republic of Benin v. Mezei ("Benin II"), No. 06 Civ. 870, 2010 WL 3564270, at *2 (S.D.N.Y. Sept. 9, 2010), Republic of Benin v. Mezei ("Benin I"), 483 F. Supp. 2d 312, 313-314 (S.D.N.Y. 2007). In 2005, Shimoff sold the Lot to Beverly Mezei for $1,250,000. See id. Upon discovering the purported sale, Benin sued Shimoff and Mezei to void the deeds effecting these two conveyances.

In Benin II, the Court granted Benin's motion for summary judgment on the grounds that the 2004 sale violated the Statute of Frauds and the officials who entered into the transaction lacked authority to do so. Benin II, 2010 WL 3564270, at *3-7. The Court subsequently conducted a non-jury trial on July 18 and

19, 2011 to decide the four claims remaining in the case:
Shimoff's claim that she is entitled to restitution of any
benefit Benin received from the purported sale; Shimoff's claim
of negligent misrepresentation against Alfred Koller, who
represented himself to be Benin's attorney in the transaction;
and Benin's and Mezei's claims against Koller for fraud.  The
Court now makes the following findings of fact and reaches the
following conclusions of law.


## LEGAL BACKGROUND AND FINDINGS OF FACT

### I.    Parties

1.    The Republic of Benin is a foreign state.  (Second Am.
Compl. ("SAC") ¶ 1.)

2.    Robin Shimoff, Beverly Mezei, and Alfred Koller are
individuals who are citizens of the State of New York.  (SAC ¶¶
2, 3, 4.)


### II.  Witnesses

3.    Shimoff, Koller, Jean-Francis Zinsou, and Bienvenu
Alogninou Houngbedji testified at the trial.

4.    The parties also entered into evidence deposition
testimony from Joel Wassi Adechi and Barry Chasky.

### III.   Beninese Mission Personnel and Property

5.    On October 1, 2004, Rogatien Biaou was the Foreign Minister of Benin; Thomas Guedegbe was the Director of Administration of Benin's Ministry of Foreign Affairs; and Joel Wassi Adechi was Benin's Ambassador to the United Nations. Ambassador Adechi served in that post from September 1999 to May 2005.  (Tr. 248:3-7, 279:11-25; SAC ¶¶ 21, 23, 31.)

6.    From 2005 to 2006, Dr. Idohou was Benin's ambassador to the United Nations.  In September 2006, Ehouzou became ambassador.  (Tr. 137:1-11, 207:8-9.)

7.    Jean-Francis Zinsou has been Benin's Ambassador to the United Nations since November 2009.  From May 2003 until his appointment as ambassador, Ambassador Zinsou was minister counsellor in charge of political and legal affairs at Benin's permanent mission in New York (the "Mission").  In October 2008, he additionally served as charge d'affaires of the Mission. (Tr. 126:14-23, 128:9-14, 131:21-24.)

8.    Bienvenu Alogninou Houngbedji is the current head of chancery for the Mission.  (Tr. 162:7-9.)

9.    The Ambassador to the Mission resides at a residence owned by Benin in Riverdale, New York (the "Residence").  (Tr. 130:24-131:8; SAC ¶ 1.)

10.   The Lot is an undeveloped lot adjacent to the Residence.  (Tr. 41:25-42:7; SAC ¶ 9.)

11.   The Mission is housed at a separate location from the Residence, in an office in Manhattan, New York (the "Office"). (SAC ¶ 1.)

## IV.   Renovation-Related Work Prior to 2004

12.   In December 2000, Benin retained Koller to act as "legal advisor to [the Mission] with respect to the renovation and reconstruction of [the Residence]" and "on such other matters as may be referred to [Koller] from time to time."   The agreement between Benin and Koller called for an "initial relationship" of eighteen months.   Koller was to be paid $5,000 per month for this work.   Ambassador Adechi approved Koller's retention.   (Pl.'s Ex. ("PX") 3, 14.)

13.   In 1998, Koller was suspended from the practice of law in New York for failure to pay the required $350 semiannual fee. He remained suspended until sometime after October 1, 2004. According to Koller, he was unaware of the suspension when it occurred and he promptly sought reinstatement when he discovered it.   (Tr. 103:13-20; 334:1-12; PX 7.)

14.   Beninese law requires that the Mission make a request to the Ministry of Foreign Affairs when it wishes to retain an attorney.   For administrative matters, the Foreign Minister can approve the request.   For matters requiring a disbursement of money, the Foreign Minister must communicate the request to the

Council of Ministers, which determines whether or not the
request should be approved.  (Tr. 227:6-230:4.)

  15.   From in or around November 2000 until sometime in 2001
or 2002, Eric Thomas performed renovation work on the Residence
and on the Office as a construction contractor and through at
least two companies, Exclusive Wear and Mission Procurement Inc.
("Mission Procurement").  Benin paid over $270,000 to Thomas,
Exclusive Wear, and/or Mission Procurement in 2000 and 2001.
(Tr. 84:3-9, 85:22-86:4, 248:13-23, 251:20-253:22; 260:22-24;
310:13-19; PX 12, 17, 24, 26.)

  16.   Koller incorporated Mission Procurement for Thomas.
(Tr. 84:10-86:4; PX 19.)

  17.   Mission Procurement subcontracted work on the Mission
to Distinct Hardwood Flooring for $58,700.  Koller signed the
contract for this work on behalf of Mission Procurement in
August 2001.  Koller did not disclose his signing of this
contract to Adechi.  (Tr. 87:24-88:19, 90:14-18, 94:8-12; PX
27.)

  18.   About two months later, Benin paid $120,000 to Mission
Procurement for the woodwork on the first and second floor of
the Mission.  (PX 26.)

  19.   A company named Exodus USA ("Exodus") also performed
work between 2001 and 2004.  Benin paid Exodus at least $14,500
in October and December 2001 and at least $203,210 between

August 2003 and February 2004.  (Tr. 103:7-12, 260:6-262:3; PX 34, 64A, 64B, 64C, 64D, 64E, 64F, 64 G.)

20.  Benin paid Koller at least $30,000 in five separate checks of $5,000 or $10,000each paid between April and October 2001.  (PX 65A-65E.)

21.  In or around February 2002, Koller sent a letter to Ambassador Adechi stating that "Eric Thomas . . . and I have not received any payment for many months."  Koller enclosed an invoice indicating that he was owed $5,000 per month from September 2001 through February 2002, for a total of $30,000, although it appears that he did receive a payment of $5,000 in October 2001.  Otherwise, Koller never requested payment from Benin.  (Tr. 120:19-22; PX 65E; DX BB.)

**V.  Purported Sale of the Lot to Shimoff**

22.  Koller testified that Guedegbe called him at some point in the fall of 2003 requesting that he attend a meeting with Guedegbe, Ambassador Adechi, and Minister Biaou.  According to Koller, Minister Biaou said at the meeting that Benin wanted to sell the Lot to pay contractors for work on the Residence. Koller claimed that Minister Biaou told him that Guedegbe "was fully authorized to conclude the transaction" if Biaou was not in New York at the time of the closing.  (Tr. 118:13-119:23.)

23.   Ambassador Adechi denied that he was ever at such a meeting or that he was contemporaneously aware of the purported sale.  However, it is not credible that the Lot would be sold without the knowledge of the ambassador who was living in the Residence right next to the Lot.[1]  (Tr. 262:4-262:19.)

24.   Shimoff testified that she and her father, Jacob Selechnik, met with Koller, Guedegbe, and Ambassador Adechi in the spring or summer of 2004 to discuss the purchase of the Lot. It was represented to Shimoff that Koller was Benin's lawyer. (Tr. 20:16-21:4, 40:6-24.)

25.   Shimoff and Selechnik work together buying and selling real estate professionally.  Shimoff has worked with Selechnik for approximately twenty years.  (Tr. 28:18-23, 29:2-8, 295:22-296:12.)

26.   On October 1, 2004, Selechnik met with Koller and Guedegbe.  Selechnik was accompanied by Ed Friedman, his attorney, and Barry Chasky, an attorney and an agent for Triad Abstract Company, a title closing company underwritten by First American Title Insurance Company.  The group met at Friedman's offices.  (Tr. 62:11-12; 292:8-297:12; 300:22-301:3.)

---

[1] Ambassador Adechi was deposed during the trial.  All parties chose to have the transcript accepted as the trial testimony rather than examining Ambassador Adechi at trial.

27.   Chasky testified that Friedman stated that the represented Selechnik or one of his children with regard to the purchase of the Lot.  (Tr. 294:1-4.)

28.   Chasky had worked with Friedman and Selechnik for at least twenty years and participated in hundreds of closings with them.  Friedman was Chasky's most frequent customer.  (Tr. 293:8-295:9.)

29.   At the meeting, Koller gave the deed to Friedman and received in return a cashier's check for $650,000, payable to Koller.  The source of the funds was Rental Masters, a company in which Shimoff testified that she had an interest.  The deed purported to reflect a conveyance from Benin to Shimoff and was signed by Guedegbe.  (Tr. 31:8-32:18, 64:6-21, 298:24-299:8; 315:23-316:2; Joint Pretrial Order ("JPTO") Ex. A; PX 6); see Benin II, 2010 WL 3564270, at *2.

30.   Koller held himself out as being an attorney for Benin and did not disclose that he had been suspended from the practice of law.  (Tr. 299:9-17.)

31.   Chasky discussed with Koller, Selechnik, and Friedman the need for a document establishing that the deed was signed by a proper party representing Benin.  Koller told Chasky that he had been informed by Minister Biaou that Guedegbe had the authority to close the transaction.  Koller refused to sign a letter drafted by Chasky that said that Koller had a letter from

Minister Biaou in his possession indicating that authority, because Koller did not yet have such a letter.  Chasky then drafted a different letter.  The second letter drafted by Chasky read:

> This is to advise that the Foreign Minister of the Republic of Benin has told me the [sic] Thomas Guedegbe, Director of Administration, Ministry of Foreign Affairs of said Republic, has authority to execute all documents in connection with the sale of the above premises to Robin Shimoff on this date.  I shall forward a letter to this effect from the Foreign Minister.

Chasky testified that he would not have closed had Koller not provided him with this letter.  Koller signed the letter. Koller was aware that, as of that time, he did not have written authorization for Benin to sell the lot.  (Tr. 62:4-64:17, 104:22-24, 300:7-302:22, 305:2-7; PX 2.)

32.  Koller never provided written authorization to Chasky or anybody else associated with the transaction, nor did he subsequently tell Chasky that he did not receive written authorization.  There is no evidence that Chasky or anybody else associated with Shimoff ever contacted Koller or anybody associated with Benin about the matter after the closing. Plainly, Chasky and Shimoff knew that they had not received the letter of purported authorization from Benin.  (Tr. 104:16-21, 305:8-10.)

33.  Ambassadors Adechi and Zinsou testified that Benin did not hire Koller for the purposes of selling the Lot.  As the

highest ranking official at the Mission with responsibility for legal affairs in 2004, Ambassador Zinsou testified he would have known if Koller had been retained.  (Tr. 131:25-132:7, 264:9-25.)

34.   However, Ambassador Adechi's deposition testimony is not credible in view of the fact that Shimoff and Koller independently recalled meeting with Ambassador Adechi over the sale of the Lot and it is not credible that the Lot could have been sold without the knowledge of the Ambassador who lived next door to it.  (Tr. 20:16-20; 118:20-119:10.)

35.   Moreover, if Biaou, Adechi, or Guedegbe decided to hire Koller for the sale of the Lot, for their own purposes, there is no reason to believe that they would have informed Ambassador Zinsou.

## VI.   Proceeds of the 2004 Sale

36.   Koller deposited the $650,000 check into an "Attorney Escrow" account.  Guedegbe signed the back of the check.  (Tr. 65:7-22; DX CCC.)

37.   Koller made several distributions from this account. He testified that he was directed to do so by Guedegbe and that he did not know why Guedegbe wanted the distributions made.  He wrote himself a check for $39,000.  He wrote a check for $39,000 to E. Thomas Construction, which he mailed to Guedegbe and which

was ultimately negotiated.  He wrote two other checks to E.
Thomas Construction, one for $40,000 and one for $20,000.  The
parties stipulated that $134,890 was paid to E. Thomas
Construction.  He approved a wire transfer of $200,000 to Biaou.
Ambassador Zinsou testified that Guedegbe also received
$200,000.  (Tr. 66:15-70:23, 105:8-23, 108:2-10, 217:19-218:8;
JPTO at 14; DX T, KK, BBB; PX 37.)

38.  Koller testified that he understood the offer of
$39,000 for himself to be "an ultimatum, take it or leave it,"
with regard to the amount owed to him by Benin.  (Tr. 66:21-
67:3.)

39.  Benin's bank records do not show any escrow account,
nor do they show any deposit by Koller.  Ambassador Zinsou
testified that Benin did not have any property in escrow with
Koller in October 2004.  Ambassador Adechi testified that Koller
never deposited money into Benin's bank account in connection
with the alleged sale of the Lot.  Ambassador Adechi also
testified that he never authorized Guedegbe to distribute moneys
in connection with the alleged sale.  (Tr. 170:9-11, 208:16-25,
265:12-17, 268:1-11; PX 4.)

40.  While it does not affect the disposition of the
current claims, there is reason to question Ambassador Adechi's
testimony in view of the fact that he reasonably could have
known of the sale of the Lot next to his residence and it is

11

difficult to believe that he would then have been ignorant of the use of the proceeds of the sale.

## VII.   Work Performed by Eric Thomas in 2005

41.   Thomas performed renovation work for Benin after the purported sale, when Ambassador Idohou took over from Ambassador Adechi.  This work was performed pursuant to a September 2, 2005, contract in which Benin agreed to pay Thomas $130,000. Thomas received three separate checks totalling $130,000 during September and October 2005.  (Tr. 206:15-21; PX 38, 39.)

42.   In November 2006, shortly after Ambassador Ehouzou took over from Ambassador Idohou, Thomas submitted another invoice requesting prompt payment of $122,000 for work previously performed.  (Tr. 205:1-206:12; PX 40.)

43.   Benin believed the 2006 invoice to be an attempt by Thomas to double-bill Benin for the contract performed and paid prior to Ambassador Ehouzou's tenure.  It refused to pay Thomas for the charges listed in the 2006 invoice.  (Tr. 206:13-207:12.)

## VIII. Sale to Mezei

44.   On October 11, 2005, Shimoff conveyed her interest in the lot to Mezei for $1,250,000.  (Tr. 33:1-4); see also Benin II, 2010 WL 3564270, at *2.

## IX.   The Claims in This Lawsuit

45.   Benin initially sued Mezei, Shimoff, the Office of the Register of the City of New York, and the City of New York.   In the Second Amended Complaint, Benin named as defendants only Shimoff, Mezei, and Koller.   The Second Amended Complaint stated four claims for relief by Benin: (1) a request for a judgment declaring Shimoff's and Mezei's deeds void pursuant to New York Real Property Law § 329, (2) a fraud claim against Koller for damages in excess of $1,250,000, (3) a conversion claim against Shimoff and Mezei for damages of $1,250,000, and (4) a request for the imposition of a constructive trust on the Lot.   (Compl. ¶¶ 2-5; SAC ¶¶ 30-64.)

46.   Shimoff answered the Second Amended Complaint, filed a counterclaim for a declaratory judgment that Benin lacked any interest in the Lot, and filed a cross-claim for contribution and/or indemnification from Mezei and Koller.   (Shimoff's Ans. to SAC ¶¶ 75-79.)

47.   Mezei answered the Second Amended Complaint and filed a cross-claim for contribution and/or indemnification from Shimoff and Koller.   (Mezei's Ans. to SAC ¶¶ 23-24.)

## X.    Prior Rulings

48.   The Court previously held that factual disputes existed as to whether the deed purporting to convey the Lot to Shimoff was forged, and that the deed was not rendered void by the Foreign Missions Act.  Benin I, 483 F. Supp. 2d at 313, 319.

49.   The Court thereafter held that the deed purporting to convey the property to Shimoff was void under the statute of frauds, because it was not accompanied by the required written authorization for Guedegbe to act as Benin's agent.  The Court held that the deed was also void because Guedegbe lacked actual authority to enter the contract.  The Court further explained that apparent authority would not be sufficient to allow Guedegbe to convey the Lot and that, even if it were, Guedegbe lacked apparent authority to do so.  Benin II, 2010 WL 3564270, at *4-7.

50.   The Court then assigned to Magistrate Judge Michael H. Dolinger the task of determining what claims or other issues remained for adjudication.  Judge Dolinger determined that (a) Shimoff sought an adjudication of whether Benin received any consideration for the sale and whether she was entitled to restitution of such benefits, pursuant to New York Civil Practice Law and Rules § 3004; (b) Shimoff and Mezei asserted cross-claims against each other; (c) Shimoff and Mezei asserted cross-claims against Koller; and (d) Benin asserted a claim

14

against Koller.  Republic of Benin v. Mezei ("Benin III"), No.
06 Civ. 870, 2010 WL 4739953, at *1-3 (S.D.N.Y. Nov. 16, 2010)
(Report & Recommendation).  The Court adopted Judge Dolinger's
Report and Recommendation.  Republic of Benin v. Mezei ("Benin
IV"), No. 06 Civ. 870, 2011 WL 564754, at *1 (S.D.N.Y. Feb. 14,
2011).

    51.  After the Court issued Benin IV, Shimoff and Mezei
executed a settlement agreement resolving the claims between
them.  As relevant to the issues before the Court, Shimoff and
Mezei agreed that Shimoff would pay Mezei the $1,250,000
purchase price unless the Court of Appeals for the Second
Circuit or this Court subsequently reversed the judgment voiding
Mezei's deed and held that Mezei was entitled to possession of
the Lot.  The contract did not require Shimoff to pay Mezei
interest on the $1,250,000 paid by Mezei in October 2005.  (Tr.
35:25-36:22, 38:13-39:20; PX 61.)

    52.  The parties then clarified their claims in a joint
pretrial order.  Benin stated that it intended to pursue a fraud
claim against Koller, but only to the extent of any restitution
sought by Shimoff.  Shimoff asserted a claim for restitution
against Benin "for the value of any benefit received by Benin in
connection with the October 1, 2004 purchase of the Lot" and for
"indemnification" against Koller; in her post-trial Proposed
Findings of Fact and Conclusions of Law, Shimoff explained that

the indemnification claim was based on a negligent
misrepresentation theory.  Mezei asserted a fraud claim against
Koller.  (JPTO at 3-9; Shimoff's Proposed Findings of Fact and
Conclusions of Law ("Shimoff's Findings") ¶¶24-27.)

## LEGAL CONCLUSIONS

1.   To the extent that any of the foregoing findings of
fact is a conclusion of law, it is hereby adopted as a
conclusion of law.

2.   To the extent relevant to this Opinion, all issues in
this case are governed by New York law.  Benin I, 483 F. Supp.
2d at 316 n.5.

### I.    Jurisdiction

3.   The Court has subject matter jurisdiction over this
case pursuant to 28 U.S.C. §§ 1331 and 1332.  Id. at 313.

### II.   Shimoff's Restitution Claim Against Benin

4.   Shimoff's first claim is for restitution of any
benefits conferred on Benin.  "The essential inquiry in any
action for unjust enrichment or restitution is whether it is
against equity and good conscience to permit the defendant to
retain what is sought to be recovered."  Paramount Film Distrib.

Corp. v. State, 285 N.E.2d 695, 698 (N.Y. 1972).  "To prevail on a claim of unjust enrichment, a party must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."  Old Republic Nat'l Title Ins. Co. v. Luft, 859 N.Y.S.2d 261, 262 (App. Div. 2008);  cf. N.Y. C.P.L.R. § 3004 (allowing courts to "adjust the equities between the parties that unjust enrichment is avoided" where a transaction is void or voidable because of, among other things, fraud, misrepresentation, or mistake); D'Angelo v. Bob Hastings Oldsmobile, Inc., 453 N.Y.S.2d 503, 504 (App. Div. 1982) (applying common-law principles of equity under § 3004).

      5.   Benin incorrectly argues that "under New York law, equitable or quasi-contractual claims are unavailable to a party if an alleged contract is unenforceable under the New York Statute of Frauds."  (Benin's Proposed Findings of Fact and Conclusions of Law ("Benin's Findings") ¶ 74.)  It is true that equitable relief is not available in the form of "the very contract claim that is barred."  Grappo v. Alitalia Linee Aeree Italiane, S.p.A., 56 F.3d 427, 433 (2d Cir. 1995).  But "[a] cause of action does exist . . . where the plaintiff 'merely seeks to recover for the value of the work performed,' as distinct from the contract price."  Id. (quoting Farash v. Sykes

Datatronics, Inc., 452 N.E.2d 1245, 1246 (N.Y. 1983)).  The
cases that Benin cites are not to the contrary.  See Morgenweck
v. Vision Capital Advisors, LLC, 410 Fed. Appx. 400, 401-02 &
n.1 (2d Cir. 2011) (summary order) (citing Grappo and holding
that the plaintiff was not entitled to an equity interest
provided for by the void contract); Roberts v. Champion Int'l,
Inc., 382 N.Y.S.2d 790, 791 (App. Div.), mot. for lv. to appeal
dismissed, 357 N.E.2d 1023 (N.Y. 1976) (rejecting attempt to
enforce a finder's fee provided by an alleged oral agreement in
light of a written contract that provided for a lower fee).

    6.  A claim for unjust enrichment or restitution must be
proven by the claimant by a preponderance of the evidence.  See
Newman v. Herbst, No. 09 Civ. 4313, 2011 WL 684165, at *6
(E.D.N.Y. Feb. 15, 2011).

    7.  Shimoff has not proven by a preponderance of the
evidence that Benin received the $650,000 purchase price that
she paid in the purported sale.  No credible testimony or
documentary evidence supports a conclusion that Benin received
the proceeds of the sale.  There is no credible evidence that
the purchase price was ever deposited into a bank account for
Benin.  The only real issue is whether payments were made from
the proceeds of the sale that were in fact for the benefit of
Benin.

8.   Shimoff has not proven by a preponderance of the
evidence that Benin received any benefit in the form of payments
to Minister Biaou or Guedegbe.  There is no evidence that Benin
authorized or was aware of these payments, or that they
discharged any obligation that Benin had to either official.
Although there was testimony that Benin sometimes paid employees
or officials to reimburse them for school expenses, (Tr. 233:3-
20; 270:24-271:3), there is no reason to believe that these
payments related to that type of authorized expenditure.

9.   Shimoff has not proven by a preponderance of the
evidence that Benin received any benefit in the form of payments
to Eric Thomas or any affiliated companies.  Although there is
evidence that E. Thomas Construction received $99,000 from the
proceeds of the sale, and the parties stipulated that it
received $134,890 of the proceeds, there is no evidence in the
record establishing that Benin had any outstanding debts to
Thomas or his companies at this time, or that this payment was
for any work actually done for Benin.  There is no evidence that
Thomas ever communicated a claim to Benin prior to October 1,
2004 for work that had previously been done but remained unpaid
and there is no evidence that any payments owed to Thomas or his
companies were not made.  Nor is there any evidence that Thomas
did any work for Benin after 2002 and prior to 2005.  Although
Exodus performed work for Benin in both 2001 and 2003 to 2004,

19

there is no evidence that this company was related to Thomas or
that the more than $200,000 that Benin paid Exodus from its
accounts in late 2003 and early 2004 did not satisfy any
obligations to Exodus.  There is no evidence of any outstanding
obligations to Exodus in October, 2004.  And although Thomas
sent a letter claiming that Benin owed it money in 2006, that
letter clearly relates to work performed in 2005, well after the
2004 transaction.  Indeed, the fact that there is a written
contract with Thomas to perform construction work in 2005
undercuts any claim that sums were owed on some unwritten
contract for work that was unpaid in 2004.  Moreover, the fact
that payments were made to E. Thomas Construction from Koller's
escrow account is insufficient to establish that the payments
were made for work that was actually done.  This is particularly
true in view of the fact that Benin subsequently refused to pay
E. Thomas Construction in 2006 for an invoice in the amount of
$122,000 because it concluded that it reflected double-billing.
Furthermore, the fact of payments by Koller cannot validate the
legitimacy of the payments in view of the apparent irregularity
of the great bulk of the payments.

    10.  Shimoff has, however, proven by a preponderance of the
evidence that Benin received a benefit in the form of the
$39,000 payment to Koller.  The record reflects that Benin owed
Koller at least $30,000 for his work on the renovation of the

20

Residence as of February 2002, for which he demanded payment. There is no evidence that Benin ever paid this amount. Moreover, his original agreement with Benin provided for a payment of$90,000, and there is no evidence that he was paid more than $30,000.  As a result of the $39,000 payment, Koller settled the debt that Benin owed him for his work.  Accordingly, Benin received a benefit in the form of satisfaction of a creditor.

11.  This is so even though Koller's debt was unenforceable.  Koller was suspended from the practice of law at the time of all work performed for Benin.  New York prohibits suspended attorneys from receiving any fees for legal services performed during while suspended, whether under contract or in quantum meruit.  <u>See</u> N.Y. COMP. CODES R. & REGS. tit. 22, § 691.10(b); <u>Glickenhouse v. Karp</u>, 877 N.Y.S.2d 88, 90 (App. Div. 2009).  Nevertheless, there is no indication that Benin knew of Koller's suspension or the fact that its debt to him was unenforceable.  Benin thus received a benefit in the form of discharging a debt that, as far as the record reveals, it believed to be valid.  Although Benin may not have owed anything to Koller in actuality, that matter is between Benin and Koller, not between Benin and Shimoff.  Benin still paid the amount to Koller and received the benefit.

12.   Benin argues that any benefit it obtained was provided without a request by Benin, and that Shimoff therefore cannot recover.  See Prestige Caterers v. Kaufman, 736 N.Y.S.2d 335, 336 (App. Div. 2002) ("Although the [defendants] . . . benefited from plaintiff's services, plaintiff made no showing in the motion court that its services were rendered at the [defendants'] . . . behest and thus there is no basis for plaintiff to recover in quantum meruit against the [defendants].").  But although Minister Biaou and Guedegbe lacked authority to retain Koller or sell the Lot, there is no evidence that they lacked authority to repay Koller for the services he did in connection with the renovation work that he was concededly authorized to perform for Benin.  Although they may have paid Benin's debts to Koller as part of a larger course of unauthorized and disloyal conduct, Benin has not provided any reason to conclude that all actions taken by Minister Biaou or Guedegbe were ultra vires and cannot be attributed to Benin. Therefore, Shimoff has shown by a preponderance of the evidence that Minister Biaou and Guedegbe acted on behalf of Benin in paying Koller and that Benin requested and received a benefit through the actions of its agents, however faithless they may have been in other regards.

13.   Benin argues that a claim for unjust enrichment is unavailable where the recipient of benefits was not aware of the

benefits.  Benin cites only federal law for this proposition,
and points to no authorities applying New York law.  (Benin's
Findings ¶ 106.)  To the extent that such a requirement exists,
it was satisfied on the facts of this case, for the same reasons
that the requirement of a request was met.  Minister Biaou and
Guedegbe could act on behalf of Benin with regard to outstanding
debts to Koller, even if they could not act on behalf of Benin
in selling the Lot, and therefore Benin had knowledge of the
benefit it received in the form of payment to Koller.

14.  Shimoff has also established by a preponderance of the
evidence that she paid the benefit that Benin received.  She
testified credibly that she owned and controlled the company
that paid the purchase price for a deed written in her name.
Accordingly, the second requirement of a claim for unjust
enrichment has been satisfied.

15.  Benin now argues that Shimoff had no legal interest in
the Lot and that, if any restitution is owed, it is owed to
Rental Masters, rather than Shimoff.  Until trial, however,
Benin consistently represented that Shimoff was the true party-
in-interest, and has never suggested that Rental Masters or any
other entity needed to be added as a party for the earlier
judgment in Benin's favor to be effective.  Benin cannot now
contradict its earlier position, which the Court plainly adopted
in its earlier rulings, where doing so would unfairly allow it

23

to void a party's deed yet evade any restitutionary obligations
it might have to that party.  See Intellivision v. Microsoft
Corp., No. 07 Civ. 4079, 2011 WL 1079080, at *6 (S.D.N.Y. Mar.
23, 2011) (discussing judicial estoppel).

   16.  Finally, the Court considers the equities between
Shimoff and Benin.  Some facts weigh in favor of allowing Benin
to keep the benefit that it received: it received the benefit
only due to the acts of faithless servants; its debt to Koller
was not actually enforceable; Shimoff sold the property for a
substantial profit and does not need to pay Mezei any interest
on the amount she has held since 2005; and, as discussed below,
Shimoff acted unreasonably in entering the 2004 transaction and
reselling the Lot.  On the other hand, Shimoff must return the
Lot to Benin and has lost the $650,000 she paid to obtain it;
her transaction with Mezzei will be reversed; there is no
evidence that Shimoff reaped any income from her one-year
ownership of the Lot; and Benin suffered no tangible harm during
the period of time when Shimoff and Mezei believed themselves to
be the owners of the Lot; and, as discussed below, Benin may be
able to pursue a claim against Koller for any money it owes
Shimoff.

   17.  On balance, the equitable considerations in this case
weigh in favor of requiring Benin to restore its $39,000 benefit
to Shimoff.  Most significantly, Benin suffered no tangible loss

from the purported sale of its Lot.  There is no evidence that Shimoff or Mezei damaged the value of the property or impeded Benin's ultimate use of the Lot, and Benin has not suggested anything that it would have done differently or any way in which its situation would have been better had Shimoff not believed that she had purchased the Lot.  Benin will recover a valuable property.  Shimoff, by contrast, paid $650,000, most of which went to Guedegbe, Minister Biaou, and Koller.  Any benefit that Benin actually received should be used to reduce Shimoff's loss.

18.  Benin presents a convoluted analysis that purportedly shows that Shimoff has actually benefited at Benin's expense, by as much as $1,906,250.  (Benin's Findings ¶¶ 86-89, 100-03.) Essentially, Benin argues that Shimoff received $1,250,000 from Mezei in October 2005 and that she should be deemed to have received both this amount and interest at a rate of 9%, the statutory pre-judgment interest rate applicable to certain claims for breach of performance of a contract or interference with title to property under New York law.  See N.Y. C.P.L.R. §§ 5001, 5004.  This analysis is deeply flawed.  First, Benin presents no authority for applying a statutory rate of interest in the course of an equitable consideration such as this. Indeed, § 5001 specifically states that "in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion."  Id. at §

25

5001(a).  There is no evidence of what benefit Shimoff received from her possession of the $1,250,000 that she must now return to Mezei.  Second, Shimoff is not recouping the great bulk of the $650,000 purchase price, leaving her worse off than before she purchased the Lot.  Even though Shimoff does not owe Mezei interest on the $1,250,000, there is no showing that she actually earned interest on that amount or that any interest she will make up for her loss.  Although Shimoff testified that she obtained title insurance for the Lot, (Tr. 33:8-10), there was no evidence as to the amount or terms of that insurance.  Third, statutory pre-judgment interest is a method of compensating the claimant for the loss if funds that  it otherwise would have had from the time that it otherwise would have had them.  In this case, Benin has stated that it had no intention of selling the Lot (SAC ¶¶ 22-23); based on that representation and the fact that Benin did, in fact, do nothing to attempt to profit from the Lot in the years after the attempted sale, it is plain that Benin suffered no monetary loss by reason of Shimoff's acquisition of the Lot.

    19.  Accordingly, Shimoff has proven her entitlement to $39,000, representing the amount of benefit that Benin received in the form of the payment to Koller.

III.   **Shimoff's Negligent Misrepresentation Claim Against Koller**

20.   Shimoff's second claim is against Koller for negligent misrepresentation.  "[A]ttorneys, like other professionals, may be held liable for economic injury arising from negligent representation." Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood, 605 N.E.2d 318, 320 (N.Y. 1992).  As a general rule, "a party may recover in tort for pecuniary loss sustained as a result of another's negligent misrepresentations" only if there was "either actual privity of contract between the parties or a relationship so close as to approach that of privity." Id.  To establish a relationship "so close as to approach that of privity, a claimant must show "(1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance." Id. at 321- 22.  Reliance must be "reasonable." J.A.O. Acq. Corp. v. Stavitsky, 863 N.E.2d 585, 587 (N.Y. 2007).

21.   A claim for negligent misrepresentation must be proven by the claimant by a preponderance of the evidence. Johnston v. Norton, 886 F. Supp. 403, 404 (S.D.N.Y. 1995).

22.   Shimoff alleges that she relied on two representations made by Koller: (1) that he was authorized to represent Benin in

the sale of the Lot, and (2) that he and Guedegebe possessed authority to convey the Lot.  (Shimoff's Findings ¶¶ 113, 118-20.)  There is no dispute that these statements were misrepresentations.

23.  Shimoff has shown that Koller was aware that these representations would be used by Shimoff for a particular purpose.  First, the evidence shows that Koller was aware that Shimoff would use his representations in deciding whether to enter the 2004 transaction.  The need for authorization to sell the Lot was a subject of discussion at the October 1, 2004 meeting, and Koller signed a letter directed at the need for proper authorization for sale of the Lot.  Shimoff has therefore satisfied the first requirement of the three-part test.

24.  Shimoff has also shown that Koller engaged in conduct linking himself and his statement to the relying party and evincing his understanding of that reliance.  Again, his signing of the letter drafted by Chasky evinced an understanding that Shimoff would not go through with the transaction if Guedegbe lacked authorization to sell the Lot.  Shimoff has therefore satisfied the third requirement of the three-part test.

25.  However, Shimoff has not shown that she <u>reasonably</u> relied on Koller's representations.  As discussed in <u>Benin II</u>, the Lot could not be sold without <u>written</u> authorization from Benin, as a matter of well-established New York law.  <u>Benin II</u>,

2010 WL 3564270, at *3-5.  Indeed, New York Real Property Law
expressly provides a means by which to establish the authority
of an agent of a foreign government to sell or otherwise grant
an interest in real property.  Id. at *4; see also N.Y. Real
Prop. Law § 331.  Shimoff is a professional buyer and seller of
real estate.  The closing was attended by Selechnik, another
real estate professional, and Friedman, an experienced attorney.
Chasky was also present, representing the title company.  By
Chasky's estimate, they had participated in hundreds of
closings.  Such sophisticated professionals could not reasonably
rely on Koller's oral representations in light of the clear
statutory need for written authorization.  See, e.g., Terra Sec.
ASA Konkursbo v. Citigroup, Inc., No. 09 Civ. 7058, 2010 WL
3835054, at *1 (S.D.N.Y. Sept. 10, 2010); Marine Midland Bank,
N.A. v. Green, 691 N.Y.S.2d 423, 424 (App. Div. 1999).

          26.  Indeed, Chasky's testimony makes clear that Chasky,
Friedman, and Selechnik were aware of the need for written
authorization.  Chasky testified that he would not have closed
the deal without the signed letter assuring Chasky that Koller
would provide written authorization from Minister Biaou.  Yet
when Koller failed to provide such authorization, neither Chasky
nor anybody else associated with Shimoff contacted Koller or
Benin to obtain such written authorization.  Shimoff went so far
as to resell the property to Mezei without a document that her

                                        29

representatives at the closing knew was required for her to have good title.

27.  Accordingly, Shimoff's claim for negligent misrepresentation is denied.

## IIV.  Benin's Fraud Claim Against Koller

28.  Benin's sole claim at this stage of the case is against Koller for fraud.  Benin seeks damages only to the extent that it owes restitution to Shimoff, an amount that is limited to the $39,000 that Koller received.

29.  Under New York law, a plaintiff seeking to recover damages for fraud "must prove a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury."  Lama Holding Co. v. Smith Barney Inc., 668 N.E.2d 1370, 1373 (N.Y. 1996).

30.  A claim for fraud must be proven by the claimant by clear and convincing evidence.  Gaidon v. Guardian Life Ins. Co. of Am., 725 N.E.2d 598, 607 (N.Y. 1999).  This standard applies to each element of fraud, including knowledge of falsity.  See, e.g., Bd. of Educ. v. Sargent, Webster, Crenshaw & Folley, 539

N.Y.S.2d 814, 819-20 (App. Div.), <u>mot. for lv. to appeal denied</u>,
551 N.E.2d 107 (N.Y. 1989).

    31.  For the purposes of deciding Benin's claim, the only
element that need be considered is Koller's alleged knowledge of
the falsity of his representations.  Benin failed to establish
by clear and convincing evidence that Koller knew his
representations were false at the high standard of "clear and
convincing evidence."  Benin proved that Koller was suspended
from practice when he performed work for Benin in 2001 and 2002
and participated in the attempted sale in 2004, that he was not
actually authorized to represent Benin with regard to any sale
of the Lot, and that Guedegbe and Minister Biaou were not
authorized to sell the Lot.  However, there is no evidence that
Koller knew the falsity of his contrary representations, and the
circumstances of his participation are not so suspicious as to
clearly and convincingly show knowledge.  Benin has provided no
reason to doubt Koller's testimony that he was not aware of his
suspension and that Minister Biaou and Guedegbe led him to
believe that they were authorized to sell the Lot, and indeed
these representations were supported by the credible testimony
that Ambassador Adechi was aware of the sale and participated in
meetings in connection with the sale.  Indeed, the fact that
Koller refused to sign an untrue letter stating that he had a
letter authorizing Guedegbe to sign the deed and that he told

Chasky only that he <u>would</u> obtain written authorization, not that he then had written authorization, supports a finding that Koller was trying not to make false representations, but was not aware of all the facts.

32.   This is not to say that Benin lacks any claim against Koller.  Koller represented Benin with regard to the renovation work, attempted to represent Benin with regard to the sale of the Lot, and accepted payment from Benin, while he was suspended from the practice of law, even if he was unaware of his suspension.  <u>See</u> N.Y. Jud. Law § 478; 22 N.Y. Comp. Codes R. & Regs. tit. 22, § 691.10(b).  He may well have acted negligently toward Benin with regard to the sale of the Lot.  However, that issue and any other claims Benin may have against Koller are not the fraud claim relating to the restitution that Benin asserted in this action.

33.   Accordingly, Benin's claim for fraud is denied.


**V.   Mezei's Fraud Claim Against Koller**

34.   The final claim is Mezei's claim against Koller for fraud.  For the reasons discussed above with relation to Benin's claim for fraud, Mezei has not established by clear and convincing evidence that Koller acted with knowledge of the falsity of his representations.

35.   Accordingly, Mezei's claim for fraud is denied.

## CONCLUSION

The Court has considered all of the arguments by all of the parties.  To the extent not specifically addressed above, such arguments are either moot or without merit.  The Court finds that Shimoff is entitled to restitution in the amount of $39,000 against Benin.  All other claims are denied.  As stated in Benin II, the deeds conveying the Lot to Shimoff and then to Mezei are declared void.

Benin's motion for judgment on partial findings under Federal Rule of Civil Procedure 52(c) is decided in accordance with the above Findings of Fact and Conclusions of Law.  To the extent that it seeks any relief inconsistent with this Opinion, the motion is denied.  The Clerk is directed to close all pending motions.  Benin is directed to submit a proposed judgment within five (5) days.  All other parties may submit any counter-judgments three (3) days thereafter.

**SO ORDERED.**

**Dated: New York, New York
      September /9, 2011**

John G. Koeltl
United States District Judge